UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
KRISTINA STEWART WARD,                          :     22 Civ. _____ (___)
                                                :
                          Plaintiff,            :
                                                :     **COMPLAINT**
             -against-                          :     **WITH JURY DEMAND**
                                                :
COHEN MEDIA PUBLICATIONS LLC, COHEN             :
MEDIA GROUP LLC, and COHEN BROTHERS             :
REALTY CORPORATION,                             :
                                                :
                          Defendants.           X
-------------------------------------------------------------------

        Plaintiff, Kristina Stewart Ward, by her counsel, alleges as follows:

                        **THE NATURE OF THE ACTION**

        1.      Plaintiff brings this action for: (1) discrimination based on sex, age, and religion

in violation of the Administrative Code of the City of New York § 8-101, et seq. ("New York City

Human Rights Law" or "NYCHRL"), New York State Executive Law § 296, et seq. ("New York

State Human Rights Law" or "NYSHRL"), Title VII of the Civil Rights Act of 1964 ("Title VII"),

and the Age Discrimination in Employment Act ("ADEA"); (2) hostile work

environment/harassment based on sex, age, and religion in violation of the NYCHRL, NYSHRL,

Title VII, and the ADEA; (3) violation of New York Executive Law § 194 ("New York State Equal

Pay Act" or "NYS EPA"), (4) retaliation in violation of the NYCHRL, NYSHRL, Title VII, and

the ADEA; (5) breach of contract; and (6) violation of the New York Labor Law §§ 198 and 193

or, in the alternative, the Administrative Code of the City of New York § 20-929 ("New York City

Freelance Isn't Free Act").

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action under § 29 U.S.C. § 1331, and the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

3.      Venue is proper under 28 U.S.C. §§ 1391(b)(2), as the Southern District of New York is the judicial district in which a substantial part of the events giving rise to Plaintiff's claims occurred.

4.      Plaintiff filed an EEOC Charge on January 2, 2021.

5.      The EEOC issued a notice of right to sue dated April 29, 2022.

## THE PARTIES

6.      Plaintiff Kristina Stewart Ward was labeled as an independent contractor employed directly by Defendant Cohen Media Publications LLC ("Cohen Media Publications") out of its office at 750 Lexington Avenue, 28th Floor, New York, New York 10022.

7.      However, Ms. Ward was effectively an employee of Cohen Media Publications.

8.      Furthermore, Ms. Ward was also effectively an employee of Defendants Cohen Media Group LLC ("Cohen Media Group"), and Cohen Brothers Realty Corporation ("Cohen Brothers Realty") (all three Defendants collectively, "Cohen Media").

9.      Cohen Media Publications, Cohen Media Group, and Cohen Brothers Realty are a single employer and/or joint employers.

   a) They are all run by Charles S. Cohen, the Chairman of Cohen Media Publications, the owner and Chairman and CEO of Cohen Media Group, and the owner and President and CEO of Cohen Brothers Realty.

b) All three companies have Steven Cherniak listed as a top executive -- COO of Cohen Brothers Realty and CEO or COO of Cohen Media Group and Cohen Media Publications.

c) All these entities use the same legal department, operations, human resources, mailroom, receptionist, conference room, and administrative staff.

d) All three entities' offices are in the same building.

e) Ms. Ward's payments alternately came from Cohen Media Publications and from Cohen Brothers Realty, further demonstrating that Mr. Cohen did not respect the corporate structures.

## FACTS

10.     Ms. Ward is a 55-year-old Mormon woman (she was 53 at the time of the termination of her employment by Cohen Media).

**Cohen Media's Gender and Age Discrimination Against Ms. Ward in Pay**

11.     Cohen Media purchased Avenue magazine, a New York City society magazine, in December 2018.  Ms. Ward was Editor-In-Chief of Avenue from April 1, 2019 to her termination on March 9, 2020.

12.     Mr. Cohen, the Chairman of Cohen Media Publications, the owner and Chairman and CEO of Cohen Media Group, and the owner and President and CEO of Cohen Brothers Realty, was listed as #228 on the 2020 Forbes 400's list of wealthiest Americans, with a net worth of $3.5 billion.

13.     Prior to Ms. Ward's arrival, Mr. Cohen already had a pattern of favoring men over women.  For example, when firing the staff at Avenue in February 2019, Mr. Cohen allowed Ms.

Ward's predecessor as Editor-In-Chief, Michael Gross, to remain but fired the rest of the staff, the majority of whom were women.  Mr. Gross later resigned of his own choice.

14.     Mr. Cohen negotiated Ms. Ward's compensation in a manner, and an amount, that was discriminatory based on her gender and age.

15.     In their negotiations, Mr. Cohen kept pressuring Ms. Ward to reduce her compensation and then repeatedly reneged on oral agreements for her compensation amount -- which Ms. Ward knows he did not do with males who worked at Avenue.

16.     On March 13, 2019, Ms. Ward met with Mr. Cohen and he offered her the position of Editor-In-Chief of Avenue magazine.  Mr. Cohen said he wanted to hire Ms. Ward that day. Ms. Ward asked for a salary of $180,000 per year -- the amount she made while previously serving as Editor-In-Chief of Hampton Style magazine.  (It is also the amount paid to Ben Widdicombe, Ms. Ward's younger male successor in this position.)  Mr. Cohen pressured Ms. Ward to come down dramatically from her requested market rate of $180,000.  After negotiating, they agreed on a 1/3 decrease to "$10,000 a month" per Mr. Cohen's suggestion ($120,000 per year) -- a verbal agreement with a handshake that day along with his promise to send her a written a contract for this amount the next day.

17.     Shockingly, Mr. Cohen subsequently claimed that he and Ms. Ward had agreed on "$10,000 per magazine issue."  This made no sense because their first issue would not arrive until the end of the year, so that would result in her being paid only $10,000 for about 3/4 of a year of work in 2019 – the equivalent of an annual salary of only $13,333 for the role of Editor-In-Chief.

18.     When Ms. Ward was later sent the written contract draft, the compensation had morphed again, into $100,000 over a 17-month period, the time covering an initial five-month ramp up for pre-production ($40,000 dispersed at $8,000 per month for five months) and then one

4

year's worth of magazines ($60,000 at a monthly rate of $5,000 per month, or $10,000 per issue.) After the initial five-month period, the $60,000 for the next year was half of the $120,000 per year Mr. Cohen had verbally agreed to (and one third of the $180,000 per year he paid the younger man performing Ms. Ward's same position just after her).  This was a bait-and-switch, as Ms. Ward told Mr. Cohen at the time.  After Mr. Cohen's initial urgency to close their deal, he proceeded to ghost Ms. Ward for weeks, clearly trying to pressure her to accept his ever-changing terms or else lose the offer.

19.    Ultimately, Ms. Ward signed a contract effective April 1, 2019 with this compensation of $100,000 over 17 months.  Mr. Cohen verbally told Ms. Ward that this diminished number would be remedied with the next contract which would compensate for the lowered numbers.

20.    Mr. Cohen changed the terms of the contract once again on October 10, 2019 with an amendment extending Ms. Ward's contract end date from October 10, 2020 to January 10, 2021.  Mr. Cohen did this because he chose to delay the publication of the first new issue of Avenue from September 2019 to January 2020.  For those extra four months (September-December 2019), he paid Ms. Ward $6,500 a month, down from the $8,000 pre-production rate for the first five months, and he reduced her per magazine fee from $10,000 per issue to $9,000.  In this hostile new negotiation, Ms. Ward's compensation was further reduced due entirely to Mr. Cohen's choice to move back the publishing date.  It resulted in her new annualized salary being $54,000 ($9,000 per issue x six annual issues).

21.    Also, while Mr. Cohen inserted clauses about paying Ms. Ward for articles she would write, he never paid her for the articles Ms. Ward wrote.

22.     Ms. Ward's ultimate pay was a fraction of her $180,000 per year market value that she had been paid in a similar position at a prior employer, and a fraction of the amount Mr. Cohen paid to Ms. Ward's younger male successor.

23.     Ms. Ward was informed by Jason Marquez, who was a paralegal for Cohen Media at the time of her employment, and who worked on her contract as well as the contracts of the other individuals who worked at Avenue, that Mr. Cohen did not manipulate and bully Ms. Ward's male colleagues with respect to their contracts, or their pay, the way he did with her.

24.     Not only did Mr. Cohen discriminate against Ms. Ward in how he handled their negotiations, but he also discriminated against her based on her gender and age in the ultimate amount of her compensation.

25.     Mr. Cohen also had Cohen Media pay Michael Calman, the male Publisher of Avenue, $10,000 a month, which is $120,000 per year plus medical benefits -- substantially more than Ms. Ward's ultimate $54,000 annualized salary ($9,000 per bi-monthly issue).

26.     Mr. Calman was paid substantially more than Ms. Ward was even though he only worked part-time -- one to two days per week in the office, plus occasional phone calls when he was out of the office while continuing to work for other clients.  In contrast, Ms. Ward worked full-time, exclusively for Avenue in the office 6 to 7 days a week, averaging 11-14 hours per day on weekdays, with weekends averaging 8 hours.

27.     Moreover, Mr. Calman's magazine experience was much less than Ms. Ward's.  He was primarily a consultant to retail businesses, not magazines.  His LinkedIn bio never even referenced Avenue as a client, and he never changed from listing himself on LinkedIn as CEO of Calman Consulting as opposed to Avenue's Publisher.  Ms. Ward's LinkedIn bio listed her as Avenue Editor-in-Chief and her name appeared at the top of Avenue's masthead, while Mr.

Calman's name was at the very bottom, acknowledging how much more significant her role was at the magazine.

28.     Upon terminating Ms. Ward's employment, Mr. Cohen hired and paid her male replacement as Editor-In-Chief, Ben Widdicombe, $180,000 per year plus benefits – over three times her annual compensation and the exact amount Ms. Ward had initially asked from Mr. Cohen, but he had refused to pay.

29.     Ms. Ward's successor, Mr. Widdicombe, is more than a decade younger than her.

30.     Cohen Media paid Mr. Widdicombe substantially more than it paid Ms. Ward even though he was far less experienced than she was.  By Mr. Widdicombe's own admission, written in the introduction to his book "Gatecrasher," when he first arrived in New York City in the year 2000, he sold hotdogs on the street to earn a living.  He went on to become a gossip columnist and writer, but he never managed a staff or been an editor-in-chief running a magazine.

31.     The fact that 15 of the magazine's staff of 23 ten months after Ms. Ward's termination remained people she hired speaks to this.  To contrast Ms. Ward's experience to that of Mr. Widdicombe, by the year 2000, Ms. Ward had already served as editor-in-chief of two publications -- Hamptons and Quest -- and had just been hired by Vanity Fair.

32.     Mr. Cohen even had Cohen Media pay Michael Grossman, a male art director for Avenue who reported to Ms. Ward, $20,000 per issue – more than double her $9,000 per issue rate.

**Cohen Media's Gender and Age Discrimination Against Ms. Ward**
**In Erroneously Classifying Her as an Independent Contractor**

33.     While Ms. Ward was nominally an independent contractor under what was called a Consulting Agreement, in reality she functioned as an employee of Cohen Media.

34.     Ms. Ward was the Editor-In-Chief of Avenue for Cohen Media -- the most important job at the magazine and not the type of job typically performed by an independent contractor.

35.     Ms. Ward's contract placed restrictions on her ability to work for anyone else.  In any event, as a practical matter, Ms. Ward could not work for anyone else because she worked full-time on Avenue.

36.     Ms. Ward worked in Cohen Media's offices, had her own company email address, office, office phone, and computer.  After Ms. Ward's termination, she was not allowed to keep or have access to any of these items, including her work product that was on the computer and emails.  Ms. Ward functioned no differently than people who were employees working on Avenue.

37.     The company paid business expenses of Ms. Ward.

38.     The company provided Ms. Ward with a corporate parking space.

39.     Even though Ms. Ward was Editor-In-Chief, she reported to Mr. Cohen and he strictly controlled all aspects of how she did her job.  For example, Ms. Ward could not hire any employees, contractors, writers, photographers, or illustrators without Mr. Cohen's specific approval of the candidate.  Mr. Cohen insisted on approving Ms. Ward's editorial plans (lineups) for each issue, signing off on each contract and fee given to a writer or photographer, and having final sign-off on all aspects of the content of the magazine before it was published.  This is not a normal relationship between a magazine's editor and its owner.  Furthermore, Mr. Cohen regularly screamed at Ms. Ward if she made any move without his knowledge and approval, even though he had to be laboriously tracked down for such input since he spent most of his time outside the office—either on his 220-foot yacht, at one of his five residences, or else traveling for one of his many other companies.  Despite the demands of his other businesses, Mr. Cohen spent copious

amounts of time on the magazine that he had purchased, and Mr. Cohen exercised control over Ms. Ward that was oppressive and mercurial.  Since Mr. Cohen had no experience in magazines, his choices were much more like capricious whims than insightful direction, and he would enforce and retaliate with threats and humiliation in front of others.  Mr. Cohen regularly undermined Ms. Ward's position with her staff and with the various people he would invite to their editorial meetings in his 28th floor conference room.

40.    Like Ms. Ward's male predecessor as Editor-In-Chief, Mr. Gross, her successor, Mr. Widdicombe, was hired and treated as an employee rather than an independent contractor even though he performed the exact same function as she did.  As an employee, Cohen Media also provided Mr. Widdicombe with medical insurance benefits and federal holidays off, and paid the employer half of Social Security contributions for him.  By contrast, Ms. Ward did not receive medical insurance benefits, 401(k), did not receive federal holidays off, received zero vacation days the entire year she worked there, and was responsible for ~~had to pay~~ 100% of Social Security contributions.

41.    As further evidence of discrimination, Mr. Calman, the male publisher, was treated as an employee with medical insurance benefits, despite only working part-time and working mostly with his other clients while Ms. Ward worked full-time exclusively for Avenue.

42.    All of the above shows both that Ms. Ward functioned as an employee despite being called an independent contractor/consultant, and that her being called an independent contractor/consultant itself was discriminatory based on her gender and age.

43.    Indeed, it seems more than coincidental that Mr. Cohen wanted Ms. Ward, a Mormon woman, to be called an independent contractor/consultant given that Title VII does not

protect independent contractors/consultants, and that Mr. Cohen has a pattern of discrimination as discussed below.

**Further Gender-Based Discrimination and Hostile Work Environment**
**While Ms. Ward Was Employed By Cohen Media**

44.     Not only was Mr. Calman paid more than Ms. Ward was because he is a man, but he was also given the windowed, corner office on Avenue's floor.  By contrast, Ms. Ward's was a windowless office, even though she was the Editor-In-Chief, at the top of the masthead, and worked in the office 6-7 days a week, while Mr. Calman only used his office 1 or occasionally 2 days a week.

45.     Even more blatantly discriminatorily, after Ms. Ward was terminated and replaced by a younger man, Mr. Widdicombe, he was given that very corner office that she had been denied.

46.     Mr. Cohen regularly objectified female workers or job candidates for Avenue, judging them by their looks and attractiveness, but did not do the same for male workers.

47.     For example, Mr. Cohen objectified and vetted female job candidates Ms. Ward was looking to hire based on their attractiveness, from her senior staffers (Features Director Heather Hodson, Senior Editor Melissa Webb, and Managing Editor Angela Schuster) and contributors (Constance White and Clemence von Mueffling), to the interns (Shaoyang Chen and Chloe Cornell).  Mr. Cohen always required a photo and a brief personal introduction to these potential hires, but he allowed only enough time (about one minute) with them to evaluate their looks.  Regarding Ms. Hodson and Ms. Schuster, both of whom are around Ms. Ward's age, Mr. Cohen remarked to Ms. Ward disapprovingly about their age, and regarding the latter he said, "she's a little overweight, *no*?"  Mr. Cohen did not make such weight-related comments about male employees.  Mr. Cohen allowed Ms. Ward to hire these women, but he didn't want direct

contact with them, insisting they not attend editorial meetings in his Cohen Brothers Realty conference room despite their senior positions at the magazine.

48.     And treating female employees differently by focusing on their looks and age took other extremes. Mr. Cohen's wife Clodagh "Clo" Cohen, who works for Cohen Media, even tried to set up Avenue's attractive female intern, Chloe Cornell, who was 17 years old, on a date with 34-year-old Ross Cohen, Charles Cohen's son by his first wife and an employee of Cohen Brothers who worked on the 28th floor. Mrs. Cohen directed Ms. Ward to have Ms. Cornell "deliver a package or letter to Ross and *let's see what happens*. She's *perfect* for him, really," she continued, "and young enough that she can still be molded. Charles isn't a fan of Ross's current girlfriend." Ms. Ward did not follow Mrs. Cohen's direction, and Ms. Ward ensured that Ross and Ms. Cornell never met.

49.     Similarly inappropriate was the way the magazine's female cover illustrator was hired by Mr. Cohen—with a focus on her sexual attractiveness. The commission offered to this illustrator was very high-profile, and Mr. Cohen insisted on choosing the candidate with zero input from Ms. Ward. Mr. Cohen chose an extremely attractive young artist, Cecilia Carlstedt, and insisted that the commissioning conversations for her artwork occur exclusively between the two of them. Ms. Ward was, however, compelled by Mr. Cohen to create a puff piece on Ms. Carlstedt -- a laudatory article in the magazine about her art career -- with Mr. Cohen vetting the photos to accompany the article. "No, not *that one*," he said when he saw the draft article. "She's much prettier than that," he insisted, and made the final photo choice himself.

50.     Mr. Cohen spent considerable time carefully vetting and approving the magazine's contributor photos, a frivolous use of his hours as the busy CEO of many companies, and further indication of how inappropriate his focus was. While doing so, he discriminated against women

based on their looks and age.  For example, Peggy Sirota is an extremely celebrated photographer and Avenue was fortunate to have her contribute, but Mr. Cohen's only comment when he saw the 65-year-old's photo was:  "She looks old; do you have an earlier photo of her?"

51.     Ms. Ward was upset at this comment and expressed that to Mr. Cohen.  Ms. Ward told Mr. Cohen they were lucky Ms. Sirota allowed Avenue to use any photo of Ms. Sirota since highlighting Ms. Sirota's contribution to Avenue benefited Avenue far more than it did Ms. Sirota.

52.     Mr. Cohen made no such comments about the two men, Mitchell Feinberg and John Huba, who appeared on that same issue's contributors page.

53.     Similar comments from Mr. Cohen occurred with Avenue's second issue's contributors page, where Harriet Mays Powell and Angela M.H. Schuster (both women Ms. Ward's age) appeared and Mr. Cohen asked for other images to choose from since he thought they too "looked old," and "could the photos be smaller?"

54.     Mr. Cohen also set extremely sexist dress codes which were communicated by the agencies that hired support staff, by Human Resources, and by Mr. Cohen himself, with women having to wear dresses and skirts.  The employee handbook also required that women wear pantyhose.  Having to wear dresses and skirts, while men were allowed to wear pants, was particularly humiliating and objectifying considering that there was an all-glass stairwell situated in the middle of the corporate floor.  Male staffers, including Mr. Cohen's visiting real estate brokers, often congregated and lingered in the waiting area directly below the stairs to be treated to a line-of-sight up women's skirts.  This was just another example of the good old boys' club perks, and another way in which women were demeaned.

55.     Ms. Ward verbally complained about this to Mr. Cohen, and to the 28th floor receptionist Milagros "Millie" Massa.  Ms. Massa also sat below those stairs and witnessed the

ogling.  Ms. Ward also complained about it to several of her Avenue colleagues, including Mr. Calman, Ms. Hodson, Ms. Chen, and Ms. Webb, suggesting that the glass stairway violated federal regulations.

56.    Despite Mr. Cohen's obsessing over the female staffers' appearance, he did not invite them to join the editorial meetings in his conference room on the 28th floor.  Yet those meetings were attended by male employees from Mr. Cohen's real estate and other businesses -- men who had no expertise in the magazine business, including Mr. Cherniak and Richard Cohen (Mr. Cohen's senior advisor regarding his luxury retail holdings including T. Anthony, Richard James, Harrys of London, and others).  Richard Cohen, for his vaguely defined services, was paid $300,000 per year, plus a rent-free apartment and a $200,000 interest-free loan, all negotiated in the same month as Ms. Ward's own contract.  The disparity between Richard Cohen'ss compensation and Ms. Ward's was stark.

57.    Even Richard Cohen recognized Mr. Cohen's sexism and confided to Ms. Ward, "I once dated a woman who worked closely with Donald Trump—he and Charles practically grew up together in the real estate business—and she and I would compare stories about how the two of them share the same vices."  "Rampant, unchecked sexism?" Ms. Ward asked, trying to get more specifics.  "Among many other attributes," was his reply.

58.    Mr. Cohen was demonstrably uncomfortable being in the presence of senior, experienced businesswomen like Ms. Ward.  He was much more comfortable with women in junior or administrative roles.

59.    In editorial meetings, Mr. Cohen humiliated Ms. Ward on a regular basis in both the content and delivery of his communications, speaking to her disrespectfully like she was an inexperienced child.  Mr. Cohen interrupted Ms. Ward, shouted and screamed at her, sneered, and

second-guessed her when she spoke from a place of authority -- all of this seemingly to unnerve her and keep her in her place. It was clearly difficult for Mr. Cohen to accept Ms. Ward's expertise.

60.     Mr. Cohen's Executive Assistant Corinne Arazi confirmed this and was aware of how Mr. Cohen treated women more harshly, telling Ms. Ward "Charles could not stand that you knew more than him in that field…so he had to crush you."

61.     To undermine Ms. Ward's authority, Mr. Cohen often—after asking her a question and hearing her answer—then asked the same question to the assembled men in the room, even though they, like him, lacked magazine experience. Furthermore, Mr. Cohen's conversations with the men about the magazine often continued without Ms. Ward after Ms. Ward left the room. Ms. Ward was turned into the de facto editorial assistant to Mr. Cohen, who was, in his mind, the "real" editor-in-chief.

62.     Despite Ms. Ward accomplishing the high editorial standards and microscopic budgetary goals set out for her when Mr. Cohen hired her, and receiving both internal and external praise for her efforts, Mr. Cohen berated her and treated her in a hyper-controlling way that was different from how he treated male employees. Mr. Cohen called, texted, and emailed Ms. Ward at all hours of the day and night and on weekends. Even though Ms. Ward worked long hours 6-7 days a week and generally never left the office to go to lunch, on one occasion when she went out to a deli for a sandwich, Mr. Cohen called her cell phone and screamed at her for being away from her desk. Similarly, when Mr. Cohen dropped by Avenue's offices with a friend and Ms. Ward was not at her desk because she went to an important photo shoot for the magazine, he screeched at her for not having been at her desk, even though his visit was impromptu and unscheduled.

63.     The worst undercutting of Ms. Ward's authority by Mr. Cohen because she is a woman, and in particular a single woman with children, came on December 4, 2019.  Ms. Ward's 13-year-old son was in the hospital having life-saving surgery from ruptured stomach ulcers; he nearly died that day from going sceptic.  That was the only workday Ms. Ward was not in the office the entire time Ms. Ward worked for Avenue.  On that day, Mr. Cohen, who was well-aware Ms. Ward was at the hospital with her son because of this life-threatening medical emergency, called a previously unscheduled editorial meeting with Mr. Calman (Publisher) and Ms. Jones (Associate Publisher) and a few members of Ms. Ward's editorial staff.  Ms. Ward's editorial staff were in shock to finally be invited into Mr. Cohen's conference room, and very distressed that crucial editorial decisions were being made by the publishing team (which is in charge of selling ads, not creating editorial content) without Ms. Ward being there.  Mr. Cohen undermined Ms. Ward's authority in front of her staff by greenlighting several advertiser-friendly projects pitched by Mr. Jones, which undermined the magazine's editorial integrity, and which came with massive budgets that Mr. Cohen had always denied Ms. Ward during the previous nine months.  One reason Ms. Ward had wanted the job so much initially was that Mr. Cohen said there would be no advertorials, and no barter (swapping goods for favorable coverage).  On this day, Mr. Cohen reneged on these two points of integrity, and made a mockery of the excruciatingly small budgets Ms. Ward was allowed to use. Mr. Cohen took advantage of Ms. Ward's role as a single, working mother by choosing that critical day to abuse his role as magazine owner and usurp the editorial authority she had with her staff and her readers -- authority that she had earned with hard work.  It was intentionally timed and demoralizing at a moment when Ms. Ward was crushed by the specter of her son potentially dying on the operating table.  What Mr. Cohen did to Ms. Ward that day took a psychological toll that is still something she is dealing with.

64.     In the twisted, sexist environment at Cohen Media, senior, professional, older women like Ms. Ward were humiliated and undermined, while women who leaned into Mr. Cohen's blatant sexism were rewarded -- the shorter the skirt, the greater the chance of being hired, and the bigger the paycheck.

65.     For example, Mr. Cohen hired Betsy Jones in October 2019 as Avenue's Associate Publisher over more qualified candidates Ms. Ward had presented to him in previous months, and he did so for these sexist reasons.  Mr. Cohen chose to hire Ms. Jones -- a younger (39 years old), single woman with no children, who was inexperienced, but who was also a tall blonde with long legs and an affinity for tight leopard pants, high heels, and short skirts.  Ms. Ward had no input on Ms. Jones' hiring.  In fact, Mr. Cohen introduced Ms. Ward to Ms. Jones only after he formally hired her.  Once Ms. Jones had left the room that first day, Mr. Cohen smiled like a naughty schoolboy, and, clearly referencing her attractiveness, said sheepishly, "She's *tallllllll.*"

66.     Mr. Cohen hired Ms. Jones as a full-time employee with benefits and paid her $180,000 per year — more than three times Ms. Ward's pay as Editor-In-Chief and the very number Ms. Ward had initially asked for.

67.     After Ms. Jones started working at Avenue, Mr. Cohen treated her favorably because of her willingness to play into his sexualization of women, despite her lack of job performance.  Ms. Jones' inability to sell ads is the very reason Mr. Cohen delayed publication of the first issue, something reported on by the New York Post.  But Ms. Jones' professional prowess is not why he hired her.  She had no good references.  A former colleague of Ms. Jones from *The Daily Front Row* told Ms. Ward that Ms. Jones knew how to "work a male boss."  Ms. Jones kept 5-inch heeled stiletto shoes in her drawer which she would put on before they went upstairs to meet with Mr. Cohen, and she would spend 10 minutes applying makeup before those meetings.

Ms. Jones once compared Mr. Cohen to another billionaire whom she dated in a way that was unsettling.  Her comments included:  "I've dated men richer than him and they treated me better than this."

68.     Most of the ads Ms. Jones brought in were fed to her from people in-house, including Ms. Ward.  Ms. Jones was only able to bring in one or two ad clients (via her sister's contacts), and the remaining ads in the magazine were from Mr. Cohen's own luxury holdings. Ms. Ward brought in the only ad to pay non-discounted rates, Hope Fragrance, yet Mr. Cohen dismissed Ms. Ward's role in securing the ad and gave Ms. Jones the commission on it.

69.     Mr. Cohen treated Ms. Jones more favorably than he treated Ms. Ward by taking Ms. Jones' side whenever a confrontation occurred between Ms. Jones and Ms. Ward, such as regarding the way Ms. Jones abused Avenue's digital editor, Maggie Malone.  Ms. Jones screamed a lot in the office, and her behavior traumatized Avenue's staff to the point that most wore headphones at their desks.  Ms. Ward fielded daily complaints from her staff about Ms. Jones, which Ms. Ward passed along to Mr. Cohen.  Mr. Cohen did nothing about the complaints.  Ms. Malone, in particular, was constantly being harassed by Ms. Jones to write advertorial puff articles for Ms. Jones' friends and potential clients.  Though Ms. Ward tried to protect Ms. Malone from Ms. Jones, as Ms. Ward did with all her staff, Ms. Malone finally quit when she got a job offer for more money at a company called Something Navy.  Ms. Jones' disruption cannot be underestimated in the toxic environment that she fomented in Avenue's office.  The former colleague of Ms. Jones from *The Daily Front Row* confirmed to Ms. Ward that the toxic, confrontational behavior Ms. Ward described to her about Ms. Jones was in keeping with Ms. Jones' behavior at previous jobs.

70.     When Ms. Ward complained to Mr. Cohen about Ms. Jones' conduct, however, he said things like, "I'm sure it's not as bad as you say."  And "Betsy is new, let's give her time," and "Come on, don't be so threatened by her."  Ms. Jones made uninformed comments in editorial meetings, and Mr. Cohen let them slide in a manner diametrically opposed to his reactions to Ms. Ward's statements.  Mr. Cohen yelled at Ms. Ward in meetings while speaking calmly to Ms. Jones, exercising restraint that he denied Ms. Ward.  Mr. Cohen even seemed to enjoy pitting Ms. Ward against this inexperienced younger, sexualized colleague.  Despite Ms. Jones' her lack of expertise, she tried to lord her younger age over Ms. Ward, taunting Ms. Ward with: "This isn't the 1980s you know, we do things differently now," and "I don't know what it was like in your day, but modern publishers can get their editors to do things for advertisers.  I can see that this must all seem very *unfamiliar t*o you."

71.     These were shockingly ageist remarks by Ms. Jones which Ms. Ward complained about to Mr. Cohen.

72.     In response to Ms. Ward's complaint, Mr. Cohen just laughed off Ms. Jones' comments and gave a knowing look to one of his male colleagues, Richard Cohen, who was also in the room.

73.     Despite Ms. Jones' lack of performance in the role of Associate Publisher, she was not fired.  Rather, she was, eventually, moved elsewhere in Mr. Cohen's companies -- to the luxury brands owned by Mr. Cohen.  Ms. Ward was told by the legal department that Ms. Jones was considered "unfireable," an oblique reference to something Ms. Jones had over Mr. Cohen.  In contrast, Ms. Ward, an older Mormon woman who dressed conservatively and behaved professionally, was terminated despite good performance, universal accolades once the magazine came out, as well as direct praise from Mr. Cohen himself.

74.     Ms. Ward is aware that others who worked at Cohen Media have experienced gender-based discrimination and a hostile work environment.  In many cases, Ms. Ward witnessed this treatment first-hand.  Among recent examples of this were a leasing assistant named Diane Sullivan, who asserted claims for sexual harassment and retaliation and was paid $60,000 in a settlement.

**Further Age-Based Discrimination And Hostile Work Environment**
**While Ms. Ward Was Employed By Cohen Media**

75.     As discussed above, Ms. Ward was discriminated against based in part on her age relative to Mr. Widdicombe in terms of her pay, her office, and her termination and replacement by him, as well as relative to Ms. Jones.

76.     Mr. Cohen's ageism also appeared in his insistence that Maya Anand, a 38-year-old public relations staffer from Mr. Cohen's film company, attend Ms. Ward's editorial meetings with him.  Ms. Anand and Ms. Ward were both mystified as to why Mr. Cohen would pull Ms. Anand from her day job on another floor in the building to sit in at the Avenue editorial meetings, as she had no expertise in magazines.  Mr. Cohen even compelled Ms. Ward to run her lists of editorials to be published by Ms. Anand for her input, which Ms. Anand gave directly to him.  The mystery was solved when Mr. Cohen finally admitted in May 2019 that he wanted Ms. Anand involved because he wanted "a younger person's point of view" on the magazine, even though Avenue's target audience was Ms. Ward's own age group, not Ms. Anand's.

77.     Furthermore, within the first month of her work for Avenue, Mr. Cohen told Ms. Ward regarding her 75-year-old contributor, Colman Andrews, the venerated James Beard Award-winning founding editor of Saveur magazine, "He's too old."

**Religion-Based Discrimination and Hostile Work Environment**
**While Ms. Ward Was Employed by Cohen Media**

78.     Mr. Cohen was extremely uncomfortable with Ms. Ward's Mormon religion, and he harassed her about it.

79.     Ms. Ward believes that her Mormon religion, and the conservative values and lifestyle that accompany it, was a significant contributor to Mr. Cohen's ultimately firing her.

80.     Ms. Ward didn't wear tight, short skirts, or flirt, or lean into the sexism like Ms. Jones did to attain her "unfireable" status.  Rather, Ms. Ward was professional and had appropriate boundaries and standards that were not in keeping with Mr. Cohen's sexist preferences.

81.     Rather than respecting her professionalism, Mr. Cohen often mocked Ms. Ward's attire such as the fashionable, long floral dress Ms. Ward wore in mid-April 2019 to an editorial meeting because her next stop was attending a botanical-themed party for Avenue.  "What are you *wearing*?  Is that standard Mormon attire?" he said to me mockingly in front of a room full of his male colleagues who laughed at his attempt to denigrate Ms. Ward.

82.     Ms. Ward expressed her displeasure with Mr. Cohen's comments, giving him a disappointed look.

83.     Comments like this about Ms. Ward's attire by Mr. Cohen related to her Mormon religion were frequent. "How could you have worked at Vogue and be Mormon?  Makes no sense. So where is *that* wardrobe now?"  Meanwhile, Mr. Cohen was paying Vogue's $100,000 a year membership fee to allow his wife to be on the "Vogue 100" committee, a pay-to-play group of rich women who paid to be invited to Vogue events and for the contact cool of associating with the magazine.  It was clear to Ms. Ward that it that Mr. Cohen was upset about Ms. Ward's association to Vogue despite her being Mormon.

84.     Mr. Cohen regularly mocked of Ms. Ward's religion, randomly inserting questions about it into conversations in front of people assembled in his conference room to talk about the magazine, not her personal life.  For example, in September 2019, Mr. Cohen disrespectfully asked Ms. Ward about the sacred Mormon practice of wearing "garments" under regular clothes.

85.     Mr. Cohen jokingly mixed up Mormons and Amish as though they were interchangeable.

86.     Mr. Cohen appeared to feel judged by Ms. Ward's religion and its standards of living, and so he lashed out at it.  He swore in meetings and then looked at Ms. Ward and said with disdain, "Oh, is that *allowed*?"  "I think we're better than that Charles" was a typical admonishment Ms. Ward made in response to such provocations.

87.     When the New York Post's Page 6 announced Ms. Ward's hiring at Avenue, Mr. Cohen flew into a rage when it, too, referenced her Mormon religion.  Ms. Ward tried to calm him down, telling him that it was just a writer looking for an ironic Mormon-covering-high society angle or hook for the article, but he wouldn't be calmed. "Why is your religion getting all the attention?" he screeched at Ms. Ward.  "It's distracting from *my* magazine. This isn't a *Mormon* magazine."  "You're absolutely right, Charles," Ms. Ward replied. "And when Graydon Carter and Anna Wintour hired me, Vanity Fair and Vogue didn't suddenly turn into Mormon magazines either. I'm a professional, I'm good at what I do, and people respect me.  These are the reasons you told me you hired me and this just happens to be something about my background that the media likes to report on."

88.     Mr. Cohen made similar comments when he read through prior articles written about Ms. Ward in the New York Times, Vogue, and multiple articles in the New York Post, all of which made references to her Mormon religion.  On April 3, 2019, the New York Post's Page

6 announced Ms. Ward's hiring and referenced her Mormonism:  "Kristina Stewart Ward is the new editor-in-chief of Avenue magazine….In a first person article for Vogue in 2007, after she married Arthur Ward, she wrote about covering back-to-back balls as a Mormon who doesn't drink alcohol and being called 'No Sex in the City.'  Stewart Ward said she 'became the Mormon mascot who could table dance for hours on no more the Pellegrino.'"  Years earlier, on May 22, 2005, the New York Post wrote about Ms. Ward's getting married and her religion again was referenced -- "So how do modern Mormon brides get hitched these days?  'By eloping!' enthused Kristina Stewart at the Valentino perfume launch the other night.  The Vanity Fair society scribe has been making bicoastal domestic plans with her 'hunky So-Cal Mormon rocket scientist and Eagle Scout' fiancé Arthur Ward."  *The New York Times* wrote a profile on Ms. Ward in 1998 that opened with "What's a nice Mormon girl, who grew up in Huntington Beach, Calif—home of shopping centers and surfers—doing as the editor of *Quest,* the Manhattan society magazine…[she] describes herself as 'definitely a card-carrying Mormon' who does not believe in drinking, smoking or premarital sex.  Her religion 'means a lot to me…it just gave me a little perspective,' Ms. Stewart said, 'to be in an environment but not totally of it.'"  The 4,000-word memoir Ms. Ward wrote in Vogue was titled by its editors, "The Outsider:  As a devout Mormon in New York high society, Kristina Stewart Ward felt torn between two worlds—until she realized she didn't have to choose."

89.     While it seems logical that a magazine's owner would appreciate that professional distance Ms. Ward's religion allowed her to keep from the subjects she covered, Mr. Cohen, who is Jewish, could not see past his own, long history of religious intolerance.

90.     For example, a female Muslim employee of Mr. Cohen's Quad Cinema asserted claims for religious and other discrimination, and was paid $200,000 in 2019 in a settlement after having worked there only six weeks.

91.     In an interview with Women's Wear Daily upon Avenue's publication, Mr. Cohen focused on the diversity Ms. Ward brought to the magazine and took credit for it.  He is quoted saying, "I think we've gone out of our way to embrace New York in an inclusionary fashion and our first issue covers Harlem and other minority-related aspects of New York life."  Given the shamelessly *exclusionary* way Mr. Cohen treated Avenue's staff, and the upsetting racist comments he frequently made, Ms. Ward and her editorial staff all discussed how this quote was particularly hypocritical.

**Ms. Ward's Complaints About Discrimination/Hostile Work Environment**

92.     Ms. Ward regularly called out Mr. Cohen when he made discriminatory remarks like described above.  Some of those occasions already are described, such as in paragraphs 40, 44, 60, 67, 70, and 75 above.

93.     Among the phrases Ms. Ward used to express her objections to Mr. Cohen's discriminatory remarks were comments like "Charles, we're better than that," "I think we're all more evolved than this Charles, can we please keep on task," and "OK, you *do* realize you just said that out loud, *right*?"

94.     Mr. Cohen typically reacted by saying something like "Oh, don't be such a scold!"

95.     Ms. Ward also objected to Mr. Cohen when he made racially-biased comments.

96.     Mr. Cohen reacted with even more hostility on those occasions.

97.     For example, in October 2019, after Ms. Anand, who was of Indian origin and was dark-skinned, left Cohen Media, Ms. Ward happened to hire a writer, Constance White, who was Black.  Mr. Cohen exclaimed to Ms. Ward, "Oh good!  Now *Constance* can be your '*new Maya.*'" Mr. Cohen was clearly referring to the fact that they were both dark-skinned minorities.

98.     Ms. Ward was stunned and embarrassed for him.  The idea that a man of his position and influence could not restrain himself from uttering such base and vulgar thoughts seemed tragic to her.  Ms. Ward finally managed to say, "Ahh, well, I can't imagine why Maya would have left Cohen Media for Netflix with comments like that."  "*Watch it!*" he snapped in reply.

99.     Subsequently, Mr. Cohen repeatedly, gleefully chanted in Ms. Ward's meetings with him, "Constance White:  *and she's Black*!" like he was the wittiest racist on the block.

100.    Ms. Ward objected each time he said this.  Ms. Ward said things like, "Charles, *please*," and "Can we at last move on from this little jingle of yours?"  His response depended on the context and his mood, but it was invariably annoyed and dismissive of Ms. Ward.

101.    Mr. Cohen sometimes combined his sexism with his racism.  In October 2019, he demanded that the article Ms. Ward was commissioning on Harlem be written by an attractive Black female writer whom he would approve. Mr. Cohen required headshots of the writing candidates, and when looking at them he critiqued each by their appearance as though this was a dating shortlist.  It was humiliating to Ms. Ward to see Mr. Cohen objectify women that way and to be roped into the process.  On a page that included a renowned writer from the *New Yorker*, Mr. Cohen pointed to a photo of Winnie Harlow--a stunning, trendy Black model, but far from Ms. Ward's first choice as a writer--and his eyes grew wide, "Can I have *her*?"

102.    Ms. Ward expressed her displeasure with Mr. Cohen's focus on his attraction to Ms. Harlow, saying "Honestly: feeling like a yenta right now Charles, and I'd prefer not to," Ms. Ward responded.

103.    Mr. Cohen waved his hand at Ms. Ward dismissively and lashed back, saying, "You take all the fun out of this."

**Ms. Ward's Discriminatory and Retaliatory Termination**

104.    On March 9, 2020, Ms. Ward was terminated by Cohen Media, purportedly for "cause."

105.    This was communicated to Ms. Ward by Mr. Cherniak in the conference room of Mr. Cohen.  In the room also were Richard Cohen, the Head of Human Resources, and a 300-pound, 6'5" bodyguard.  This meeting was the first time Ms. Ward ever met anyone from HR.  Mr. Cohen had just concluded his regular editorial meeting with Ms. Ward and retreated to his office, shamefully leaving her termination to his lieutenants.

106.    Mr. Cherniak handed Ms. Ward a letter stating that she was being fired "for cause."

107.    The letter did not specify what the "cause" was.  Despite Ms. Ward's immediate and repeated request for elaboration on the exact "cause" he was invoking, neither Mr. Cherniak, nor anyone else, ever communicated it to her—verbally or in writing.

108.    On March 9, Ms. Ward was told that she had 15 minutes to clear out what she could from her office and to leave the building while chaperoned by the bodyguard.  This was the most humiliating moment of Ms. Ward's career.  Ms. Ward had done nothing to warrant such a walk of shame, and she was denied access to the work she created during her year there.

109.    Ms. Ward's termination was discriminatory based on her gender, age, and religion, and was retaliation for her objections to Mr. Cohen's sexism, racism, ageism, religious discrimination, and discriminatory remarks.

110.    As discussed above, Mr. Cohen discriminated against Ms. Ward in pay and created a hostile work environment during her employment based on her gender, age, and religion and in response to her objections to his discrimination, so he had already demonstrated the attitudes that caused her discriminatory and retaliatory termination.

Case 1:22-cv-06431   Document 1   Filed 07/28/22   Page 26 of 44


111.    Ms. Ward's willingness to call Mr. Cohen out on his sexism, racism, ageism, and religious discrimination led to this retaliatory termination.

112.    As discussed earlier, Cohen Media replaced Ms. Ward with Mr. Widdecombe, a younger male who had far less experience in the magazine business than she did, and was someone who had never been editor-in-chief of a magazine.

113.    The timing of the termination also reinforces that it was in part because Ms. Ward was not just a woman but a single woman with children.

114.    Ms. Ward's termination on March 9, 2020 occurred when the COVID-19 pandemic was starting to spread quickly in New York City.  Three days later, Mayor Bill de Blasio declared a state of emergency and announced that New York City's public schools would be closing.  The possibly of closing the public schools had been being discussed for some time before that.  It was obvious to Mr. Cohen by March 9, 2020 that the schools would be closing, and that Ms. Ward, as a single mother with an 11-year-old and 13-year-old in public school, would need to work from home.  Mr. Cohen generally did not allow employees to work from home, and in fact insisted that Avenue's staff continue to work from the office even after Governor Cuomo ordered non-essential personnel to stop coming into the office.  Instead, Mr. Cohen terminated Ms. Ward's employment pre-emptively, which he wouldn't have done if she were a man with a wife who could stay home to take care of the children.

115.    Indeed Mr. Widdecombe, who replaced Ms. Ward, was a single man with no children.

116.    Ms. Ward had never received any performance improvement plan or the like.  Nor had Ms. Ward ever even met or spoken to the head of Human Resources before her termination.

117.    Not only had Ms. Ward not received a performance improvement plan, but despite Mr. Cohen's shameful, discriminatory treatment of her at the office, he praised her actual work.

a)  Mr. Cohen bragged about Ms. Ward while they were out at public events where he would swan her around the room like a prize.

b)  Mr. Cohen praised Ms. Ward's work extensively.  Mr. Cohen's praise of Ms. Ward's work was reflected in numerous emails, which even include praise of her by Mr. Cohen just one month before he fired her.

c)  Mr. Cohen's Executive Assistant, Corinne Arazi, can confirm that Mr. Cohen praised Ms. Ward's work extensively.  Mr. Cohen also handed out copies of Avenue to "his entire rolodex" according to Ms. Arazi, and bragged about how much better this incarnation of Avenue was than its predecessor.

d)  Mr. Cohen also praised Ms. Ward in print, on April 3, 2019 telling *The New York Post*, "She [Kristina] brings real heft to Avenue, which is fitting given the magazine's impressive readership."  To *The Hollywood Reporter* on January 23, 2020, he said, "I think that the new staff is doing what they need to do" and "I'm very encouraged by Avenue's reception," a few days after Ms. Ward and her new staff published their first issue.

e)  Indeed, the media world's reaction to Ms. Ward's work was similarly laudatory.  A day earlier, on January 22, 2020, *Women's Wear Daily* reported, "Helping make Cohen's dreams a reality is a plethora of former glossy magazine staffers, led by editor in chief Kristina Stewart Ward, the one-time *Vanity Fair* society editor and *Harper's Bazaar* executive editor."

118.    Along with this internal and external praise, Ms. Ward accomplished the high editorial standards and microscopic budgetary goals set out for her when Mr. Cohen hired her. Ms. Ward achieved the work goals stated verbally to her by Mr. Cohen and those goals stated in her contract, assembling a top-flight staff and group of contributors despite an impossibly limited budget and Avenue's tarnished reputation from recent years.  People came to work for Avenue because of Ms. Ward's longstanding relationships with them, her reputation, and the good will toward her that existed in the magazine industry, something Mr. Cohen specifically referenced when he hired her. "People like you, and that's important," Mr. Cohen said the day he offered Ms. Ward the job.  People also liked the magazine Ms. Ward produced based on media coverage and the feedback Mr. Cohen said he received. Mr. Cohen's choice of an Associate Publisher, Ms. Jones, was a massive misstep, and one Avenue paid for with dismal ad sales and internal staff turmoil.  While Mr. Cohen was constantly moving the goal post when it came to spending—obliging Ms. Ward to follow miniscule budgets while lavishing Ms. Jones with tens of thousands of dollars for articles they commissioned while Ms. Ward was with her son in the hospital— Ms. Ward always remained frugal per his direction.

119.    Not only was Ms. Ward unceremoniously terminated without explanation, but Cohen Media then essentially tried to extort her.  On March 9, 2020, Cohen Media still owed Ms. Ward $18,000 in compensation for the two completed issues of Avenue (Mr. Cohen was always late signing off on checks to her).  Cohen Media initially withheld Ms. Ward's money, saying they would only pay her if she signed a release of legal claims and a non-disclosure agreement.  After Ms. Ward objected and threatened legal action, Cohen Media finally relented and paid her.

**Damage To Ms. Ward Financially And Emotionally**

120.   As discussed earlier, Cohen Media discriminated against Ms. Ward in her pay based on her gender and age.

121.   In addition, since Cohen Media's discriminatory, retaliatory termination of Ms. Ward on March 9, 2020, she has been unable to obtain other employment and earn any income, despite faithful efforts to do so.

122.   Ms. Ward has suffered significant and egregious emotional distress as a result of Mr. Cohen's discriminatory and retaliatory treatment and termination of her, causing her to seek out therapy and take anti-anxiety medication -- both while she was employed there and since her termination.  Mr. Cohen's discriminatory treatment of Ms. Ward was so psychologically abusive that after meetings with him she regularly retreated to the ladies' room to cry.  Ms. Ward began medicating with Clonazepam, an anti-anxiety medication, before her meetings with Mr. Cohen. In Ms. Ward's successful, 32-year career in magazines, she had neither cried after meetings nor needed therapy or medication, reflecting that she had never endured so discriminatory and toxic an environment as the one Mr. Cohen created.  To this day, Ms. Ward continues to suffer emotional distress, take this medication and engage in therapy since her termination as a result of Mr. Cohen's treatment of her.

123.   Ms. Ward might have chosen to cry in her office, except that she was told by several third parties outside Cohen Media that her office—along with the rest of the offices and conference rooms—were surreptitiously monitored and recorded by audio and video. This practice was not publicly disclosed to employees, and Ms. Ward believes it is illegal.

124.    Ms. Ward believes that Cohen Media discriminated against her and created a hostile work environment because of her sex, age, and religion, and retaliated against her after she complained about such and other types of discrimination.

## FIRST CLAIM
### (Sex Discrimination In Violation Of Title VII)

125.    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

126.    Plaintiff is an employee within the meaning of 42 U.S.C. § 2000e(f).

127.    Defendants are employers within the meaning of 42 U.S.C. § 2000e(b).

128.    By their actions detailed above, Defendants unlawfully discriminated against Plaintiff on the basis of her sex in violation of Title VII.

129.    Plaintiff is entitled to back pay and front pay or reinstatement, damages for emotional distress, attorney's fees and costs, interest, and punitive damages.

## SECOND CLAIM
### (Gender-Based Hostile Work Environment/Sexual Harassment In Violation Of Title VII)

130.    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

131.    Plaintiff is an employee within the meaning of 42 U.S.C. § 2000e(f).

132.    Defendants are employers within the meaning of 42 U.S.C. § 2000e(b).

133.    By their actions detailed above, Defendants unlawfully created a hostile work environment that was objectively and subjectively offensive through severe or pervasive conduct based on sex in violation of Title VII.

134.    Plaintiff is entitled to back pay and front pay or reinstatement, damages for emotional distress, attorney's fees and costs, interest, and punitive damages.

**THIRD CLAIM**
**(Sex Discrimination In Violation Of The NYCHRL)**

135.    Plaintiff repeats and realleges all of the allegations contained herein, as if separately alleged.

136.    Plaintiff is a "person" under § 8-102(1) of the New York City Human Rights Law.

137.    Defendants are an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

138.    By their actions detailed above, Defendants unlawfully discriminated against Plaintiff on the basis of her sex in violation of the New York City Human Rights Law, § 8-107(1)(a).

139.    Plaintiff is entitled to back pay and front pay or reinstatement, damages for emotional distress, attorney's fees and costs, interest, and punitive damages.

**FOURTH CLAIM**
**(Gender-Based Hostile Work Environment/Sexual Harassment**
**In Violation Of The NYCHRL)**

140.    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

141.    Plaintiff is a "person" under § 8-102(1) of the New York City Human Rights Law.

142.    Defendants are an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

143.    By their actions detailed above, Defendants treated Plaintiff less well based on her sex and unlawfully created a gender-based hostile work environment/sexually harassed her in violation of the New York City Human Rights Law.

144.    Plaintiff is entitled to remedies including but not limited to damages for emotional distress, attorney's fees and costs, and prejudgment interest, in amounts to be determined at trial.

145.    In addition, because Defendants created a gender-based hostile work environment/sexually harassed Plaintiff with willful or wanton negligence, or recklessness, a conscious disregard of the rights of others, or conduct so reckless as to amount to such disregard, Plaintiff is entitled to punitive damages.

**FIFTH CLAIM**
**(Sex Discrimination In Violation Of The NYSHRL)**

146.    Plaintiff repeats and realleges the allegations contained above as if separately set forth herein.

147.    Defendants are an "employer" for purposes of § 292 of the New York State Human Rights Law.

148.    By their actions detailed above, Defendants unlawfully discriminated against Plaintiff on the basis of her sex race in violation of New York State Human Rights Law.

149.    Plaintiff is entitled to back pay and front pay or reinstatement, damages for emotional distress, attorney's fees and costs, interest, and punitive damages.

**SIXTH CLAIM**
**(Gender-Based Hostile Work Environment/Sexual Harassment**
**In Violation Of The NYSHRL)**

150.    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

151.    Defendants are an "employer" for purposes of § 292 of the New York State Human Rights Law.

152.    By their actions detailed above, Defendants unlawfully created a gender-based hostile work environment/sexually harassed Plaintiff in violation of the New York State Human Rights Law.

153.    Plaintiff is entitled to remedies including but not limited to damages for emotional distress, attorney's fees and costs, prejudgment interest, and punitive damages, in amounts to be determined at trial.

## SEVENTH CLAIM
### (Age Discrimination In Violation Of The ADEA)

154.    Plaintiff repeats and realleges the allegations contained above as if separately set forth herein.

155.    Plaintiff is an employee within the meaning of 29 U.S.C. § 630(f).

156.    Defendants are an employer within the meaning of 29 U.S.C. § 630(b).

157.    By their actions detailed above, Defendants unlawfully discriminated against Plaintiff on the basis of her age in violation of the ADEA.

158.    Plaintiff is entitled to back pay and front pay or reinstatement, damages for emotional distress, attorney's fees and costs, and interest.

159.    Defendants' violation of the ADEA was willful, entitling Plaintiff to liquidated damages.

## EIGHTH CLAIM
### (Age-Based Hostile Work Environment/Harassment
### In Violation Of The ADEA)

160.    Plaintiff repeats and realleges the allegations contained above as if separately set forth herein.

161.    Plaintiff is an employee within the meaning of 29 U.S.C. § 630(f).

162.    Defendants are an employer within the meaning of 29 U.S.C. § 630(b).

163.    By their actions detailed above, Defendants unlawfully created a hostile work environment that was objectively and subjectively offensive through severe or pervasive conduct based on age in violation of the ADEA.

164.     unlawfully discriminated against Plaintiff on the basis of her age in violation of the ADEA.

165.     Plaintiff is entitled to back pay and front pay or reinstatement, damages for emotional distress, attorney's fees and costs, and interest.

166.     Defendants' violation of the ADEA was willful, entitling Plaintiff to liquidated damages.

## NINTH CLAIM
### (Age Discrimination In Violation Of The NYCHRL)

167.     Plaintiff repeats and realleges all of the allegations contained herein, as if separately alleged.

168.     Plaintiff is a "person" under § 8-102(1) of the New York City Human Rights Law.

169.     Defendants are an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

170.     By their actions detailed above, Defendants unlawfully discriminated against Plaintiff on the basis of her age in violation of the New York City Human Rights Law, § 8-107(1)(a).

171.     Plaintiff is entitled to back pay and front pay or reinstatement, damages for emotional distress, attorney's fees and costs, interest, and punitive damages.

## TENTH CLAIM
### (Age-Based Hostile Work Environment/Harassment
### In Violation Of The NYCHRL)

172.     Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

173.     Plaintiff is a "person[s]" under § 8-102(1) of the New York City Human Rights Law.

174.    Defendants are an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

175.    By their actions detailed above, Defendants unlawfully created an age-based hostile work environment/harassed Plaintiff in violation of the New York City Human Rights Law.

176.    Plaintiff is entitled to remedies including but not limited to damages for emotional distress, attorney's fees and costs, and prejudgment interest, in amounts to be determined at trial.

177.    In addition, because Defendants created an age-based hostile work environment/harassed Plaintiff with willful or wanton negligence, or recklessness, a conscious disregard of the rights of others, or conduct so reckless as to amount to such disregard, Plaintiff is entitled to punitive damages.

## ELEVENTH CLAIM
### (Age Discrimination In Violation Of The NYSHRL)

178.    Plaintiff repeats and realleges the allegations contained above as if separately set forth herein.

179.    Defendants were an "employer" for purposes of § 292 of the New York State Human Rights Law.

180.    By their actions detailed above, Defendants unlawfully discriminated against Plaintiff on the basis of her age in violation of New York State Human Rights Law.

181.    Plaintiff is entitled to back pay and front pay or reinstatement, damages for emotional distress, attorney's fees and costs, interest, and punitive damages.

**TWELFTH CLAIM**
**(Age-Based Hostile Work Environment/Harassment**
**In Violation Of The NYSHRL)**

182.    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

183.    Defendants are an "employer" for purposes of § 292 of the New York State Human Rights Law.

184.    By their actions detailed above, Defendants unlawfully created an age-based hostile work environment/harassed Plaintiff in violation of the New York State Human Rights Law.

185.    Plaintiff is entitled to remedies including but not limited to damages for emotional distress, attorney's fees and costs, prejudgment interest, and punitive damages, in amounts to be determined at trial.

**THIRTEENTH CLAIM**
**(Discrimination Based On Religion In Violation Of Title VII)**

186.    Plaintiff repeats and realleges the allegations contained above as if separately set forth herein.

187.    Plaintiff is an employee within the meaning of 42 U.S.C. § 2000e(f).

188.    Defendants are an employer within the meaning of 42 U.S.C. § 2000e(b).

189.    By their actions detailed above, Defendants unlawfully discriminated against Plaintiff on the basis of her religion in violation of Title VII.

190.    Plaintiff is entitled to back pay and front pay or reinstatement, damages for emotional distress, attorney's fees and costs, interest, and punitive damages.

## FOURTEENTH CLAIM
### (Religion-Based Hostile Work Environment/Harassment
### In Violation Of Title VII)

191.    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

192.    Plaintiff is an employee within the meaning of 42 U.S.C. § 2000e(f).

193.    Defendants are employers within the meaning of 42 U.S.C. § 2000e(b).

194.    By their actions detailed above, Defendants unlawfully created a hostile work environment that was objectively and subjectively offensive through severe or pervasive conduct based on religion in violation of Title VII.

195.    Plaintiff is entitled to back pay and front pay or reinstatement, damages for emotional distress, attorney's fees and costs, interest, and punitive damages.

## FIFTEENTH CLAIM
### (Discrimination Based On Religion In Violation Of The NYCHRL)

196.    Plaintiff repeats and realleges all of the allegations contained herein, as if separately alleged.

197.    Plaintiff repeats and realleges the allegations contained above as if separately set forth herein.

198.    Plaintiff is a "person" under § 8-102(1) of the New York City Human Rights Law

199.    Defendants are an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

200.    By their actions detailed above, Defendants unlawfully discriminated against Plaintiff on the basis of her religion in violation of the New York City Human Rights Law, § 8-107(1)(a).

201.    Plaintiff is entitled to back pay and front pay or reinstatement, damages for emotional distress, attorney's fees and costs, interest, and punitive damages.

**SIXTEENTH CLAIM**
**(Religion-Based Hostile Work Environment/Harassment**
**In Violation Of The NYCHRL)**

202.    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

203.    Plaintiffs is a "person" under § 8-102(1) of the New York City Human Rights Law.

204.    Defendants are an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

205.    By their actions detailed above, Defendants unlawfully created a religion-based hostile work environment/harassed Plaintiff in violation of the New York City Human Rights Law.

206.    Plaintiff is entitled to remedies including but not limited to damages for emotional distress, attorney's fees and costs, and prejudgment interest, in amounts to be determined at trial.

207.    In addition, because Defendants created a religion-based hostile work environment/harassed Plaintiff with willful or wanton negligence, or recklessness, a conscious disregard of the rights of others, or conduct so reckless as to amount to such disregard, Plaintiff is entitled to punitive damages.

**SEVENTEENTH CLAIM**
**(Discrimination Based On Religion In Violation Of The NYSHRL)**

208.    Plaintiff repeats and realleges the allegations contained above as if separately set forth herein.

209.    Defendants are an "employer" for purposes of § 292 of the New York State Human Rights Law.

210.    By their actions detailed above, Defendants unlawfully discriminated against Plaintiff on the basis of her religion in violation of New York State Human Rights Law.

211.    Plaintiff is entitled to back pay and front pay or reinstatement, damages for emotional distress, attorney's fees and costs, interest, and punitive damages.

## EIGHTEENTH CLAIM
### (Religion-Based Hostile Work Environment/Harassment In Violation Of The NYSHRL)

212.    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

213.    Defendants are an "employer" for purposes of § 292 of the New York State Human Rights Law.

214.    By their actions detailed above, Defendants unlawfully created a religion-based hostile work environment/harassed Plaintiff in violation of the New York State Human Rights Law.

215.    Plaintiff is entitled to remedies including but not limited to damages for emotional distress, attorney's fees and costs, prejudgment interest, and punitive damages, in amounts to be determined at trial.

## NINETEENTH CLAIM
### (Violation Of The NYS EPA)

216.    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

217.    At all relevant times, Plaintiff was an "employee" for purposes of § 190 of the New York Labor Law.

218.    Defendants are an "employer" for purposes of § 190 of the New York Labor Law.

219.     By their actions detailed above, Defendants unlawfully paid Plaintiff wages at a rate less than men for equal work or substantially similar work.in violation of the New York State Human Rights Law.

220.     Plaintiff is entitled to remedies including but not limited to the amount of the wage differential, liquidated damages of an additional 300% of the wage differential, attorney's fees and costs, and prejudgment interest, in amounts to be determined at trial.

## TWENTIETH CLAIM
### (Retaliation In Violation Of Title VII)

221.     Plaintiff repeats and realleges the allegations contained above as if separately set forth herein.

222.     At all relevant times, Plaintiff was an "employee" under Title VII, 42 U.S.C. § 2000e(f).

223.     Defendants are an "employer" under Title VII, 42 U.S.C. § 2000e(b).

224.     Plaintiff engaged in protected activity.

225.     Defendants retaliated against Plaintiff for having engaged in the protected activity by terminating her employment in violation of Title VII.

226.     As a result of Defendants' retaliatory conduct, Plaintiff has suffered substantial damages, including emotional pain and mental anguish, in an amount to be determined at trial.

227.     Defendants' retaliatory conduct was taken with reckless indifference to Plaintiff's, entitling her to punitive damages under Title VII.

## TWENTY-FIRST CLAIM
### (Retaliation In Violation Of The ADEA)

228.     Plaintiff is an employee within the meaning of 29 U.S.C. § 630(f).

229.     Defendants are an employer within the meaning of 29 U.S.C. § 630(b).

230.     Plaintiff engaged in protected activity.

231.     Defendants retaliated against Plaintiff for having engaged in the protected activity by terminating her employment in violation of the ADEA.

232.     As a result of Defendants' retaliatory conduct, Plaintiff has suffered substantial damages, including emotional pain and mental anguish, in an amount to be determined at trial.

233.     Plaintiff is entitled to back pay and front pay or reinstatement, damages for emotional distress, attorney's fees and costs, and interest.

234.     Defendants' violation of the ADEA was willful, entitling Plaintiff to liquidated damages.

### TWENTY-SECOND CLAIM
### (Retaliation In Violation Of The NYCHRL)\

235.     Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

236.     Plaintiff is a "person" under § 8-102(1) of the New York City Human Rights Law.

237.     Defendants are an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

238.     Plaintiff engaged in protected activity.

239.     By their actions detailed above, Defendants retaliated against Plaintiff, including but not limited to by terminating her employment, in violation of the New York City Human Rights Law.

240.     Plaintiff is entitled to remedies including but not limited to back pay, front pay or reinstatement, damages for emotional distress, attorney's fees and costs, and prejudgment interest, in amounts to be determined at trial.

241.    In addition, because Defendants retaliated against Plaintiff with willful or wanton negligence, or recklessness, a conscious disregard of the rights of others, or conduct so reckless as to amount to such disregard, Plaintiff is entitled to punitive damages.

## TWENTY-THIRD CLAIM
### (Retaliation In Violation Of The NYSHRL)

242.    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

243.    Defendants are an "employer" for purposes of § 292 of the New York State Human Rights Law.

244.    Plaintiff engaged in protected activity.

245.    By their actions detailed above, Defendants retaliated against Plaintiff, including but not limited to by terminating her employment, in violation of the New York State Human Rights Law.

246.    Plaintiff is entitled to remedies including but not limited to back pay, front pay or reinstatement, damages for emotional distress, attorney's fees and costs, prejudgment interest, and punitive damages, in amounts to be determined at trial.

## TWENTY-FOURTH CLAIM
### (Breach Of Contract)

247.    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

248.    Defendants breached Plaintiff's contract because Plaintiff was terminated without cause on March 13, 2019 on a contract that ran through January 10, 2021.

249.    Defendants also breached Plaintiff's contract because they failed to pay Plaintiff additional amounts for the articles she wrote as required by her contract.

**TWENTY-FIFTH CLAIM**
**(Violation Of The New York Labor Law §§ 198 and 193)**

250.    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

251.    At all relevant times, Plaintiff was an "employee" for purposes of § 190 of the New York Labor Law.

252.    Defendants are an "employer" for purposes of § 190 of the New York Labor Law.

253.    By their actions detailed above, Defendants failed to pay Plaintiff wages earned (a) from the termination of her employment on March 13, 2019 until the end of her contract on January 10, 2021, and (b) for the articles she wrote as required by her contract, in violation of New York Labor Law §§ 191 and 193.

254.    Plaintiff is therefore entitled to her unpaid wages, 100% liquidated damages, 9% per year interest, attorneys' fees, and costs.

**TWENTY-SIXTH CLAIM**
**(In The Alternative To The Twenty-Fifth Claim,**
**Violation Of The Freelance Isn't Free Act)**

255.    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately alleged.

256.    By their actions detailed above, Defendants failed to pay Plaintiff wages earned (a) from the termination of her employment on March 13, 2019 until the end of her contract on January 10, 2021, and (b) for the articles she wrote as required by her contract, in violation of the Administrative Code of the City of New York § 20-929 ("New York City Freelance Isn't Free Act").

257.    Plaintiff is therefore entitled to her unpaid wages, 100% liquidated damages, 9% per year interest, attorneys' fees, and costs.

WHEREFORE, while reserving the right to seek additional damages as available, Plaintiff demands judgment against Defendants as follows:

A.    An award of back pay;

B.    An award of reinstatement or front pay;

C.    An award of damages to compensate Plaintiff for her mental anguish, humiliation, embarrassment, and emotional injury, in amounts to be determined at trial;

D.    An award of reasonable attorneys' fees and the costs of this action;

E.    An award of punitive damages, in amounts to be determined at trial;

F.    Pre-judgment interest at the rate of 9% per year;

G.    Post-judgment interest;

H.    An order directing Defendants to cease and desist from its unlawful practices, and directing any other applicable injunctive relief; and

I.    All such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        July 28, 2022

Law Office of Michael Grenert, PLLC


By: _____s/_____
        Michael E. Grenert
     120 Riverside Blvd. #12T
     New York, New York 10069-0524
     Telephone Number: (917) 553-2050
     Facsimile: (917) 725-8525
     Email: mgrenert@grenertlaw.com

     Law Office of Andrea Paparella, PLLC
     Andrea M. Paparella, Esq.
     4 Dunlap St.
     Salem, MA 01970
     Telephone:  (617) 680-2400
     Facsimile:  (914) 462-3287
     Email:  amp@andreapaparella.com