UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KRISTINA STEWART WARD,

                Plaintiff,

       -against-

COHEN MEDIA PUBLICATIONS LLC, et al.,

                Defendants.

Case No. 1:22-cv-06431 (JLR)

**<u>OPINION AND ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

      Plaintiff Kristina Stewart Ward ("Plaintiff") brings this action against Cohen Media

Publications LLC, Cohen Media Group LLC, and Cohen Brothers Realty Corporation (together,

"Defendants")[1] alleging (1) discrimination based on sex, age, and religion in violation of the

New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code. § 8-101, *et seq.*; the

New York State Human Rights Law ("NYSHRL"), N.Y. Exec Law. § 296, *et seq.*; Title VII of

the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; and the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*; (2) hostile work

environment and/or harassment based on sex, age, and religion in violation of the same statutes;

(3) retaliation in violation of the same statutes; (4) breach of contract; (5) violation of the New

York State Equal Pay Act ("NYS EPA"), N.Y. Lab. Law § 194; and (6) violation of the New

York Labor Law ("NYLL"), N.Y. Lab. Law §§ 191, 193, 198, or in the alternative, violation of

the New York City Freelance Isn't Free Act ("FIFA"), N.Y.C. Admin. Code § 20-929.  Now

before the Court is Defendants' motion to dismiss the entire Complaint for failure to state a

---

[1] In her Complaint, Plaintiff often refers to Defendants together as "Cohen Media."  *See*, *e.g.*,
ECF No. 1 ("Compl.") ¶ 11 (alleging that "Cohen Media" purchased *Avenue* magazine).  For
purposes of accurately capturing Plaintiff's allegations in this Opinion, the Court will do the
same, and will distinguish the parties where appropriate.

claim.  *See* ECF No. 19 ("Br."); ECF No. 25 ("Reply").  Plaintiff opposes the motion.  ECF No. 22 ("Opp.").  For the reasons set forth below, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND[2]

Plaintiff is a Mormon woman who was 53 years old at the time of the events relevant to this dispute.  Compl. ¶ 10.  Charles S. Cohen ("Cohen") is the Chairman of Defendant Cohen Media Publications ("Publications"); owner, Chairman, and Chief Executive Officer ("CEO") of Defendant Cohen Media Group ("CMG"); and owner, President, and CEO of Defendant Cohen Brothers Realty ("CBR").  *Id.* ¶¶ 9, 12.  Cohen Media purchased *Avenue*, a magazine about New York City society, in December 2018.  *Id.* ¶ 11.  In and around March 2019, Plaintiff began negotiations with Cohen to serve as editor-in-chief of the magazine.  *Id.* ¶¶ 14-18.  Plaintiff alleges that she asked for a salary of $180,000, but in part due to "pressure" from Cohen, eventually verbally agreed to a salary of $10,000 a month, or $120,000 a year.  *Id.* ¶ 16.  Cohen later claimed that the agreement was for $10,000 per issue of the magazine.  *Id.* ¶ 17.  Plaintiff ultimately entered a written contract to serve as editor-in-chief of the magazine as of April 1, 2019, and agreed to be paid $100,000 over a 17-month period.  *Id.* ¶¶ 18-19.  Plaintiff alleges that this salary, as well as another salary modification in October 2019 that included extending the contract from October 2020 to January 2021, *id.* ¶ 20, was less than the salary paid to her

---

[2] Unless otherwise noted, the facts stated herein are from the Complaint, which the Court accepts as true, and material referenced in the Complaint.  *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 176 (2d Cir. 2013); *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 110-11 (2d Cir. 2010).

successor, Widdicombe,[3] who was a younger man in the same role with far less experience than Plaintiff, *id.* ¶¶ 28-32.

Plaintiff alleges that, even though she was "labeled as an independent contractor" pursuant to the contract, she was in fact an employee of Defendants.  *See id.* ¶¶ 6-9, 33-43. During her time as editor-in-chief, Plaintiff alleges that – contractually and practically – she could not work for anyone other than Defendants.  *Id.* ¶ 35.  In her role, she had access to a Cohen Media e-mail address, office, phone, and computer, and was not allowed to retain any of these items after she was terminated.  *Id.* ¶ 36.  Cohen Media paid her business expenses and provided her with a parking space.  *Id.* ¶¶ 37-38.  Cohen also monitored her work closely, required approval of any employees, contractors, or vendors she sought to hire, and required approval of her editorial plans – becoming angry if Plaintiff failed to run decisions by him.  *Id.* ¶ 39.  Plaintiff alleges that she did not receive certain benefits, including medical benefits, a 401k, and vacation days.  *Id.* ¶ 40.  However, Mr. Calman, a male publisher, "was treated as an employee" and received medical benefits even though he worked "mostly with his other clients." *Id.* ¶ 41.  Plaintiff's successor, Widdicombe, was also hired as an employee and not an independent contractor.  *Id.* ¶ 40.

Plaintiff alleges that she was subject to discriminatory acts while employed by Defendants.  Specifically, she alleges that Mr. Calman and Widdicombe were given corner offices on *Avenue*'s floor, while she was given a windowless office.  *Id.* ¶¶ 44-45.  During editor meetings, Cohen would speak to Plaintiff "disrespectfully like she was an inexperienced child." *Id.* ¶ 59.  He interrupted Plaintiff, yelled at her, and second-guessed her statements in the

---

[3] In the Complaint, his last name is sometimes spelled "Widdicombe," *see id.* ¶ 28, and sometimes "Widdecombe," *see id.* ¶ 112.  For consistency, the Court will refer to him as "Widdicombe."

meeting. *Id.* He would repeat questions already answered by Plaintiff to hear from the men in the room during these meetings. *Id.* ¶ 61. Plaintiff's view – which she alleges was confirmed by Cohen's Executive Assistant Corinne Arazi – was that Cohen was intimidated by women in authority positions, and could not accept Plaintiff's expertise in the magazine industry. *Id.* ¶¶ 58-60. Plaintiff alleges that Cohen was demanding and controlling of her time, contacting her at all hours, seven days a week, and yelling at her for being away from her desk when he tried to contact her. *Id.* ¶ 62. Cohen's brother, Richard Cohen, confided in Plaintiff that Cohen's vices were similar to those of Donald Trump, and concurred with Plaintiff's assessment that those vices included "[r]ampant, unchecked sexism[.]" *Id.* ¶ 57.

Plaintiff alleges that the "worst undercutting" of Plaintiff's authority "because she is a woman, and in particular a single woman with children" was on December 4, 2019. *Id.* ¶ 63. On that day, Plaintiff's young son was in the emergency room having surgery for a life-threatening ruptured ulcer. *Id.* Cohen knew this and nonetheless called an unscheduled editorial meeting with some of Plaintiff's staff, as well as Mr. Calman, the publisher, and Ms. Jones, the assistant publisher. *Id.* At the meeting, Cohen green-lit several projects that Plaintiff had not approved, including certain "advertiser-friendly" pitches by Ms. Jones and "advertorials." *Id.* These projects, in Plaintiff's view, were inconsistent with Plaintiff's and Cohen's agreed-upon approach to the magazine. *Id.* Furthermore, Cohen gave the "advertiser-friendly" projects large budgets, in contrast to Plaintiff's small budget. *Id.* Plaintiff alleges Cohen took these actions on a day he knew Plaintiff was unavailable in order to undermine her and "usurp" her editorial authority. *Id.*

She also alleges that Cohen insisted that Maya Anand, a 38-year-old public relations staffer who worked for Cohen's separate film company, attend editorial meetings with him. *Id.*

¶ 76.  He "compelled" Plaintiff to run lists by Ms. Anand, who gave her views on those lists

directly to Cohen.  *Id.*  Cohen eventually explained that he asked Ms. Anand to join meetings and

share her views in order to get "a younger person's point of view."  *Id.*  Plaintiff contends that

this illustrates Cohen's discriminatory actions because the target audience of *Avenue* magazine

was women of Plaintiff's age.  *Id.*

   Plaintiff further alleges that Cohen was uncomfortable with her Mormon religion and the

conservative values and lifestyle that accompanied it.  *Id*. ¶¶ 78-79.  He would mock her attire,

including a long floral dress Plaintiff wore to work prior to a party, saying, "What are you

*wearing*?  Is that standard Mormon attire?" in front of the room.  *Id.* ¶ 81.  She expressed her

"displeasure" by giving him a "disappointed look."  *Id.* ¶ 82.  He also made comments including:

"How could you have worked at Vogue and be Mormon?  Makes no sense.  So where is *that*

wardrobe now?"  *Id.* ¶ 83.  He once asked her about the Mormon practice of wearing "garments"

under regular clothes, confused Mormonism and the Amish religions, and after swearing in a

meeting, asked Plaintiff if that was "*allowed*."  *Id.* ¶¶ 84-86.  Cohen once became enraged when

Plaintiff's religion was mentioned in a New York Post Page Six announcement about her hiring

because he did not like that her religion was "distracting from [his] magazine."  *Id.* ¶ 87.  In

instances like these, Plaintiff alleges that she admonished Cohen, and refuted his statements.

*See, e.g.*, *id.* ¶ 86 (responding "I think we're better than that Charles"); ¶ 87 (stating that she is

good at what she does and the media "just happens" to like reporting on her background).

   Plaintiff also alleges that she witnessed discriminatory acts, which contributed to a hostile

work environment.  She alleges that she regularly witnessed Cohen objectify women who were

job applicants, and seek to hire women primarily based on their "attractiveness."  *Id.* ¶ 47.  He

commented on women's weight, but not on the weight of male colleagues.  *Id.*  If Plaintiff hired

a woman who Cohen deemed to be overweight or unattractive, he would insist upon little to no contact with her.  *Id.*  Furthermore, Plaintiff alleges that Cohen's wife sought to "set up" a young 17-year-old female intern with an older male employee, Cohen's 34-year old brother, Ross Cohen. *Id.* ¶ 48.  Cohen also inserted himself into editorial decisions to, according to Plaintiff, ensure that younger attractive women graced *Avenue*'s pages.  *Id.* ¶ 50.  For example, he made comments such as "[s]he looks old; do you have an earlier photo of her?" when he saw the image that would be used to credit a contributing photographer's work.  *Id.*; *see also id.* ¶ 53 (alleging similar comments about images of women).  He did not make similar comments about men.  *Id.* ¶ 51.  Plaintiff alleges that comments like these upset her, and she expressed as much to Cohen. *Id.* ¶ 51.

Cohen also required female staff to wear dresses/skirts and pantyhose.  *Id.* ¶ 54. According to Plaintiff, male staffers in the office would stand under the glass staircases to look up women's skirts.  *Id.*  Plaintiff complained about this to Cohen, a receptionist, and several colleagues at the magazine, to no avail.  *Id.* ¶ 55.

Plaintiff further alleges that female staffers were generally not permitted to attend editorial meetings with Cohen, despite the fact that male employees who were involved in Cohen's real estate business (not the magazine) were permitted to attend.  *Id.* ¶ 56.  Cohen also showed a preference and favoritism to women who "play[ed] into his sexualization of women." *Id.* ¶ 67.  For instance, Plaintiff alleges that the assistant publisher, Ms. Jones, was paid $180,000 a year – the salary that Plaintiff requested – even though she was unqualified for her position.  *Id.* ¶¶ 66-67.  Plaintiff alleges that Ms. Jones brought in very limited advertising business to the magazine, but Cohen nonetheless favored Ms. Jones over Plaintiff, who was more successful and dressed less provocatively.  *See id.* ¶¶ 68-69.  Ms. Jones allegedly screamed in the office, and

harassed Plaintiff's staff into writing "advertorial puff articles" for her clients, causing distress among Plaintiff's employees. *Id.* ¶ 69.  Plaintiff brought her concerns about Ms. Jones to Cohen, who dismissed them outright. *Id*. ¶ 70.  Ms. Jones also told Plaintiff, who was older, that she had much to learn from Ms. Jones, and that things may have been done differently "in [Plaintiff's] day . . . ." *Id.*  When Plaintiff complained about these allegedly ageist comments, Cohen laughed off her comments. *Id.* ¶¶ 71-72.  Ms. Jones was never fired, as Plaintiff was, but rather moved to different teams within Cohen's companies. *Id.* ¶ 73.

Plaintiff generally alleges that she "regularly" called out Cohen's comments and behavior. *See generally id.* ¶¶ 92-103.  She would use phrases including "Charles, we're better than that," *id.* ¶ 93, to which Cohen would call her a "scold," *id.* ¶ 94.  In one instance, after Cohen compared two dark-skinned female employees, Plaintiff sarcastically commented that she could not "imagine why Maya [Anand, who was of Indian origin] would have left Cohen Media for Netflix with comments like that." *Id.* ¶ 98.  Plaintiff alleges that this did not deter Cohen, who would repeatedly comment about a new black employee – "Constance White: *and she's Black!*" *Id.* ¶ 99.  Plaintiff claims that she repeatedly asked Cohen to refrain from such comments. *Id.* ¶ 100.

Finally, Plaintiff alleges that she was fired on March 9, 2020 for discriminatory and retaliatory reasons. *See generally id.* ¶¶ 104-119.  That day – the first time she met anyone from the Human Resources department – Plaintiff was told that she was being fired "for cause." *Id.* ¶¶ 104-106.  When Plaintiff asked for more information, she was not given any; instead, she was told she had 15 minutes to leave the building. *Id.* ¶¶ 107-108.  Plaintiff alleges that she never received a performance plan from Human Resources, nor was she otherwise on notice of any sort

of "for cause" reason for the ultimate firing; in fact, Cohen had frequently complimented Plaintiff's work, and *Avenue* had received praise for her work.  *Id.* ¶¶ 117-118.

Plaintiff alleges that she was fired in part because, on the cusp of the COVID-19 pandemic and school closures in New York City, Cohen anticipated that Plaintiff would seek to work from home as a single mother.  *Id.* ¶ 114.  Her replacement, Widdicombe, was a single man with no children.  *Id.* ¶ 115.

As part of the termination, Cohen Media attempted to withhold $18,000 from Plaintiff for the two completed magazine issues, and only paid her upon threat of a lawsuit.  *Id.* ¶ 119. Plaintiff has also allegedly been financially and emotionally injured by Cohen's actions.  In particular, she alleges that despite reasonable attempts, she has been unable to find other work since March 9, 2020.  *Id.* ¶ 121.  During her work for Defendants, she often cried in the ladies' room[4] and alleges she suffered emotional distress as a result of the discrimination and retaliation against her, resulting in the need for medication and therapy.  *Id.* ¶ 122.

Plaintiff filed this suit on July 28, 2022.  *See* Compl.  On November 14, 2022, Defendants moved to dismiss the Complaint.  ECF No. 16; *see* Br.  Plaintiff opposed that motion on December 8, 2022.  *See* Opp.  Defendants filed a reply on December 23, 2022.  *See* Reply.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The court must "accept all factual allegations as true and

---

[4] Plaintiff alleges that she could not cry in her office because Cohen monitored his employees through audio and video devices.  Compl. ¶ 123.

draw all reasonable inferences in the plaintiff's favor." *DiFolco*, 622 F.3d at 110-11 (quoting

*Shomo v. City of N.Y.*, 579 F.3d 176, 183 (2d Cir. 2009)) (internal brackets omitted).  But the

court shall not "accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556

U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "Factual allegations must be enough to raise a

right of relief above the speculative level," *Twombly*, 550 U.S. at 555, and "[t]his standard

requires that the complaint allege 'more than a sheer possibility that a defendant has acted

unlawfully' and more than 'facts that are merely consistent with a defendant's liability," *In re*

*Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 180 (quoting *Iqbal*, 556 U.S. at 678).

"Applying this standard is 'a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense.'"  *Id*. (quoting *Iqbal*, 556 U.S. at 679).

## DISCUSSION

### I.    Employment Relationship

Defendants' primary argument in their motion to dismiss is that all of Plaintiff's claims

under Title VII, the ADEA, the NYLL, and the NYSHRL fail because Plaintiff has not properly

pleaded that she had an employment relationship with Defendants.  *See* Br. at 7-9; *see Eisenberg*

*v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 113 (2d Cir. 2000) (Title VII and

NYSHRL applies to employees); *Frankel v. Bally, Inc.*, 987 F.2d 86, 88-89 (2d Cir. 1993)

(ADEA applies to employees).  The Court disagrees.[5]

The parties agree that determining whether a party is an employee or an independent

contractor is a fact-intensive inquiry, and depends on a variety of factors articulated by the

---

[5] Both parties agree that the NYSHRL was amended to extend protection to independent
contractors.  *See* N.Y. Exec. Law § 296-D; Opp. at 1; Reply at 1.  Because the Court concludes
that Plaintiff has adequately pleaded that she was an employee, the Court need not address the
impact of this change in the law to Plaintiff's claims at this time.

Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989). *See Frankel*, 987 F. 2d at 90 (applying common law agency principle test in *Reid* to ADEA claims); *Knight v. State Univ. of N.Y. at Stony Brook*, 880 F.3d 636, 642 (2d Cir. 2018) (applying *Reid* factors to Title VII claims); *Eisenberg*, 237 F.3d at 113-14 (applying *Reid* factors to Title VII and NYSHRL claim); *see also* Br. at 7.  The *Reid* factors include the following:

> [1] the hiring party's right to control the manner and means by which the product is accomplished . . . [;] [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; and [13] the tax treatment of the hired party.

*Reid*, 490 U.S. at 751-52.  "In applying the *Reid* factors to anti-discrimination cases, the court is to give 'added weight' to the first factor – the hiring party's right to control the manner and means of work – due to its quintessential importance in the common law conception of an employee-employer relationship."  *Meyenhofer v. Larsen & Toubro Infotech Ltd.*, 503 F. Supp. 3d 39, 46 (S.D.N.Y. 2020) (quoting *Eisenberg*, 237 F.3d at 114-16).  Moreover, a court should not "rigidly" rely on "formalistic factors like employee benefits and tax treatment . . . ."  *Id.*

Similarly, under the NYLL, a court must consider whether plaintiffs: "(1) worked at their own convenience; (2) were free to engage in other employment; (3) received fringe benefits; (4) were on the employer's payroll; and (5) were on a fixed schedule."  *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 599 (E.D.N.Y. 2012); *see also Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 544 (S.D.N.Y. 2014).

Defendants primarily argue that Plaintiff has failed to adequately plead that she was an employee because Cohen had minimal control over her work, and her employment contract specifically said she was hired as an "independent contractor." Br. at 8-9. The Court does not agree and finds that Plaintiff has pleaded sufficient facts to survive a motion to dismiss on the question of whether she was an independent contractor or employee.

Plaintiff has pleaded that Defendants – through Cohen – exercised control over the manner and means in which she worked. She alleges that her work was monitored closely; Cohen approved all employees, contractors, and other vendors that she hired; and, Cohen demanded approval of her editorial plans, expressing anger if Plaintiff failed to run decisions by him. Compl. ¶ 39. She worked in Defendants' offices, and was given a Cohen Media e-mail address, personal office, phone, and computer – all of which she could not keep when terminated. *Id*. ¶ 36. Cohen Media paid her business expenses and provided her with a parking space, *id.* ¶¶ 37-38, and both Publications and CBR sent her required payments, *id.* ¶ 9. With respect to the high level of skill required for the role, she further alleges that the editor-in-chief position was the "most important" role at the magazine, and that her contract, and the hours required of the job, made it impossible for her to work for others. *Id.* ¶¶ 34-35. Both Plaintiff's predecessor and successor for the editor-in-chief position were hired as employees. *Id.* ¶ 40. Accordingly, numerous *Reid* factors weigh in favor of employee status, at least at the pleading stage.

In response, Defendants point to language in the "Consultant Agreement," attached to their motion. ECF No. 18-1. To be sure, the Consultant Agreement clearly states that it is not an employment agreement, and that Publications did not exercise "control" over Plaintiff's work. *Id.* § 1(d). Defendants also highlight that the Consultant Agreement made clear that the job

would require all of Plaintiff's time for the roughly year-long contract period.  Br. at 9 (ECF No.
18-1 § 1(e)).

However, an independent contractor agreement is not determinative of employment
status and, here, the Consultant Agreement does not outweigh the numerous facts that Plaintiff
alleges, all of which together demonstrate at least a plausible claim that Plaintiff was an
employee under the *Reid* test.  *See Meyenhofer*, 503 F. Supp. 3d at 48 (holding that "what
Plaintiff, Defendant, or anyone else labeled Plaintiff . . . is not dispositive" of whether there was
an employer-employee relationship); *Legeno v. Corcoran Grp.*, 308 F. App'x 495, 497 (2d Cir.
2009) (noting that an "Independent Contractors Agreement" did not necessarily establish an
independent contractor relationship where other *Reid* factors demonstrated an employee
relationship); *Karupaiyan v. CVS Health Corp.*, No. 19-cv-08814 (KPF), 2021 WL 4341132, at
*9 (S.D.N.Y. Sept. 23, 2021) (permitting claims to proceed based on employment relationship
even though the contract agreement "expressly classifie[d] [the] [p]laintiff as an 'independent
contractor'").  Accordingly, at this early stage, Plaintiff has sufficiently pleaded at least a
plausible claim that she was an employee entitled to the protections of Title VII, the ADEA, the
NYLL, and the NYSHRL.

Defendants next argue that, even if Plaintiff was an employee and not an independent
contractor, Plaintiff's claims against CMG and CBR (as opposed to Publications, the
counterparty to the Consultant Agreement) fail because they did not employ Plaintiff, and she
has failed to allege facts that constitute a claim under a single employer or joint employer theory.
Br. at 10-12.  When "two or more entities are involved in an individual's employment," a court
may find liability for multiple entities under two doctrines: first, the "single employer" doctrine
that "applies when 'two nominally separate entities are actually part of a single integrated

enterprise,'" *Lima v. Addeco*, 634 F. Supp. 2d 394, 399-400 (S.D.N.Y. 2009) (quoting *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005)), or second, the "joint employer" doctrine that applies when "two or more entities, according to common law principles, share significant control of the same employee," *Felder v. United States Tennis Ass'n*, 27 F.4th 834, 843 (2d Cir. 2022).

Both doctrines require a court to consider various factors. "Whether a group of entities qualifies as a single integrated enterprise turns on four factors: '(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 133 (S.D.N.Y. 2020) (quoting *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 224 (2d Cir. 2014)). The second factor – centralized control of labor relations – is the "central concern." *Id.* at 133-34 (quoting *Brown*, 756 F.3d at 226). Whether or not a group of entities have a "joint employer relationship" depends on various factors guided by who has "control" of the employee, including but not limited to whether the alleged joint employer was "involved in training him, supervising him, issuing his paychecks, covering his insurance or other benefits, or controlling other means of his employment (such as providing his uniform or other tools needed for the position)." *Felder*, 27 F.4th at 846. Generally speaking, both doctrines are often fact-dependent, and not appropriate for a determination at the motion to dismiss stage. *See Brown*, 756 F.3d at 226 ("Whether two related entities are sufficiently integrated to be treated as a single employer is generally a question of fact not suitable to resolution on a motion to dismiss."); *Bautista v. PR Gramercy Square Condo.*, --- F.Supp.3d ---, No. 21-cv-11093 (ER), 2022 WL 17156628, at *4 (S.D.N.Y. Nov. 22, 2022) ("Consequently, determining joint employment status is 'essentially a factual

issue,' that, like determining single employer status, 'is not suitable to resolution on a motion to dismiss.'" (internal citation omitted)).

Defendants argue that Plaintiff has failed to plausibly allege that Defendants are joint employers or a single enterprise because Plaintiff does not sufficiently allege that CMG and CBR exercised "significant control" over Plaintiff's work as editor-in-chief or her daily activities, and because Plaintiff otherwise points to only conclusory allegations to support her claims against CMG and CBR.  *See* Br. at 10-12.  Plaintiff argues that she has adequately pleaded sufficient facts under both of these theories.  The Court agrees with Plaintiff.

Plaintiff alleges that all three Defendants are run by Cohen; that he has similar executive roles in each company, Compl. ¶ 9(a); and, that Steven Cherniak is also a top executive for the three companies, acting as chief operating officer or in a similar executive role, *id.* ¶ 9(b). Plaintiff further alleges that all three Defendants "use the same legal department, operations, human resources, mailroom, receptionist, conference room, and administrative staff."  *Id.* ¶ 9(c). The three companies also all work out of the same building.  *Id.* ¶ 9(d).  Finally, Plaintiff alleges that her payments came from both Publications and CBR.  *Id.* ¶ 9(e).  Elsewhere in the Complaint, Plaintiff alleges that employees at CMG and CBR worked regularly with *Avenue* magazine, including Ms. Anand, who worked for Cohen's film company, but attended editorial meetings at Cohen's request.  *Id.* ¶ 76.  Mr. Cherniak, an executive for all three Defendants, and the Head of Human Resources for all three Defendants, informed Plaintiff of her termination.  *Id.* ¶¶ 104-105.

Plaintiff's allegations establish at least a plausible claim that Defendants' operations were interrelated under a single enterprise theory or that they were joint employers.  The allegations show shared employees and spaces, common management between Defendants, and centralized

control of labor relations.  All three Defendants are alleged to use the same legal, human resources, and support staff, and Plaintiff was paid through at least two of the entities.  *See id.* ¶¶ 9, 104-105.  Plaintiff was terminated by employees who worked for all three Defendants. Cohen is alleged to have controlled and managed all three Defendants, and there does not appear to have been distinctions made with regard to which entity could pay or fire Plaintiff.  Thus, the Complaint contains "specific factual allegations [that] adequately plead the functional symbiosis of the two defendants, which allegedly shared management and a principal place of business . . . ."  *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 323 (S.D.N.Y. 2020).

*Bautista* is instructive.  In *Bautista*, the plaintiff was hired to work at the Gramercy Square Condominium, and the Clipper Entities argued that they did not employ the plaintiff.  *See Bautista*, 2022 WL 17156628, at *1, 3.  However, because the plaintiff received his offer letter on Clipper Equity LLC letterhead, and was terminated by an employee who worked for the Clipper Entities, the court concluded that it was plausible the Clipper Entities "had final authority over hiring and firing decisions, as well as over payroll management."  *Id.* at *5 (finding that the plaintiff pleaded that "there was commonality of hiring, firing, and pay between the Clipper Defendants and the Gramercy Square Defendants").  The court found that the plaintiff had sufficiently alleged centralized control of labor relationships.  *See id.*  With the Cohen entities, here, as in *Bautista*, "[g]iven the particular facts of this case, and the slight variations in name between the entities in question, it is reasonable to conclude that at this stage of litigation, [Plaintiff] lacks access to information that could further elucidate the specific relationship between these entities."  *Id.*

Notably, in *Bautista*, the court admonished the plaintiff for engaging in group pleading, which is often "not sufficient to hold an entity liable under the single or joint employer doctrines

[because] concrete allegations against specific entities are required in order to create a plausible inference of an employment relationship among them." *Id.* (citing *Lawrence v. Int'l Bus. Mach. Corp.*, No. 12-cv-08433 (DLC), 2017 WL 3278917, at *16 (S.D.N.Y. Aug. 1, 2017)). However, group pleading in *Bautista* was not fatal to the complaint because the allegations "still put[] the Clipper Defendants on notice 'of what the claim is and the ground upon which it rests.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Here, too, although Plaintiff refers to Defendants as a group throughout much of her pleading, *see, e.g.*, Compl. ¶ 8, Defendants are on notice of the claims and grounds for the claims, and there are sufficient allegations that all Defendants share control over Plaintiff for purposes of single or joint employer theories of liability, *see id.* ¶ 9. Therefore, Defendants' argument that Plaintiff fails to allege a single enterprise theory or joint employer relationship fails at the motion to dismiss stage.

## II.    Discrimination Claims Based on Sex and Religion

Moving to Plaintiff's substantive claims, Plaintiff alleges claims for sex discrimination and discrimination based on her religion under Title VII, the NYCHRL, and the NYSHRL. *Id.* ¶¶ 125-129; 135-139; 146-149; 186-190; 196-201; 208-211. Under Title VII, an employer may not discriminate against a person because of that person's sex or religion, among other things. 42 U.S.C. § 2000e-2(a)(1). A claim for discrimination under Title VII is analyzed using the "now-familiar three-part framework set forth" in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) (the "*McDonnell Douglas* framework"). *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014). Under this framework, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). Once a plaintiff has met this burden, "the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action." *Id.* (quoting *McDonnell Douglas*,

411 U.S. at 802).  A plaintiff will satisfy her initial burden if she can show: "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for the position [s]he held; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Id.*

However, "a plaintiff in a Title VII matter need not plead the elements of a *prima facie* case under the *McDonnell Dougla*s framework, because it [is] an evidentiary standard."  *Zoulas v. N.Y.C. Dep't of Educ.*, 400 F. Supp. 3d 25, 52 (S.D.N.Y. 2019) (discussing discrimination claims under Title VII as compared to claims under ADEA).  Rather, at the motion to dismiss stage, a plaintiff "need only give plausible support to a minimal inference of discriminatory motivation."  *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015); *see also Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019).  Therefore, the Second Circuit has articulated that, "absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent."  *Id.*  Put differently, at the motion to dismiss stage, "a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015).  To do this, a plaintiff may "alleg[e] facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination."  *Id.* at 87; *see also Farmer*, 473 F. Supp. 3d at 324.

Discrimination claims under the NYSHRL, prior to its amendment in August 2019, and Title VII are generally considered "analytically identical."  *Farmer*, 473 F. Supp. 3d at 323

(quoting *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 n.7 (2d Cir. 2019)); *see also EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 832 (S.D.N.Y. 2013) (citing *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010)).  Claims under the NYCHRL, and under the NYSHRL after it was amended, on the other hand, while analyzed using the same framework as Title VII, contain, "as to some elements, more liberal pleading and proof standards." *Farmer*, 473 F. Supp. 3d at 327; *see Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013); *Eur. v. Equinox Holdings, Inc.*, No. 20-cv-07787 (JGK), 2022 WL 4124763, at *7 n.10 (S.D.N.Y. Sept. 9, 2022).  Courts must "analyze NYCHRL claims separately and independently from any federal and state law claims," construing the NYCHRL "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik*, 715 F.3d at 109 (internal citations omitted).  Therefore, where a plaintiff states a claim for discrimination under Title VII, she "necessarily" states a claim for discrimination under both the NYSHRL and NYCHRL. *Zuckerman v. GW Acquisition LLC*, No. 20-cv-08742 (VEC), 2021 WL 4267815, at *7 (S.D.N.Y. Sept. 20, 2021).

Turning first to her claims for sex discrimination, Plaintiff has pleaded that she is a member of a protected class (a woman), and that she suffered an adverse employment action (termination). *See* Compl. ¶¶ 10, 104-119.[6]  Defendants primarily argue that Plaintiff has failed

---

[6] Plaintiff further alleges that she was paid less than a younger, male successor, with less experience and was not given certain benefits or a corner office. *See id.* ¶¶ 25, 28-30 (alleging Widdicombe, who was hired to replace Plaintiff, was paid a $180,000 salary, which Plaintiff had requested and been denied), 44-45 (alleging men received corner office).  Generally, a pay disparity has been considered to be an adverse employment action in this Circuit. *See Palmer v. Shchegol*, 406 F. Supp. 3d 224, 232 (E.D.N.Y. 2016).  Defendants do not address the sufficiency of these possible adverse actions in their papers.  However, because the Court concludes that Plaintiff plausibly alleges at least one adverse employment action (termination), "the Court need not and does not resolve at this stage" whether other conduct also constitutes adverse actions, or even a "'mosaic' of information supporting an inference of discrimination." *Torre v. Charter Commc'ns, Inc.,* 493 F. Supp. 3d 276, 288 n.2 (S.D.N.Y. 2020).

to allege facts from which the Court can infer that discriminatory intent motivated her termination.  *See* Br. at 17; Reply at 5-6.  Plaintiff's allegations with respect to the circumstances surrounding her termination are minimal.  She alleges that she was inexplicably and unexpectedly terminated "for cause," and that further explanation was not provided.  Compl. ¶¶ 104-108.  But "an employer who discriminates is unlikely to leave a 'smoking gun' attesting to discriminatory intent" and therefore a "victim[] of discrimination [is forced] to rely on circumstantial evidence."  *Moazzaz v. MetLife, Inc.*, No. 19-cv-10531 (JPO), 2021 WL 827648, at *12 (S.D.N.Y. Mar. 4, 2021) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).

Plaintiff has pleaded sufficient circumstantial evidence to "support to minimal inference of discriminatory motivation."  *Menaker*, 935 F.3d at 30.  For example, she alleges that Cohen regularly yelled at her, and treated her like a child, as compared to her male colleagues.  Compl. ¶¶ 59, 61.  Her Complaint alleges corroborating discussions with Cohen's Executive Assistant Corinne Arazi, and his brother Richard Cohen, that Cohen's treatment of Plaintiff was the result of sexism and being threatened by women in authority.  *Id.* ¶¶ 57-58, 60.  She further alleges that Cohen regularly made sexist remarks about women, including about their level of attractiveness and weight.  *Id.* ¶¶ 47-49.  Cohen sought to ensure that only women he deemed attractive were featured in *Avenue*.  *Id.* ¶¶ 50, 53.  Plaintiff alleges that Cohen required women to wear skirts and dresses, implicitly allowing men to look up women's skirts from the glass staircase in the offices, despite her complaints.  *Id.* ¶ 54.  She also alleges that he favored women who were willing to cater to his preferences for more sexualized behavior, and Plaintiff was not.  *See, e.g.*, *id.* ¶ 67.  Women were generally not permitted to attend editorial meetings, and Cohen took advantage of Plaintiff's responsibilities as a mother to make decisions (which he knew she

opposed) at a meeting she could not attend. *Id.* ¶¶ 56, 63. Indeed, Plaintiff alleges that the timing of her termination in early March 2020 on the cusp of the COVID-19 pandemic reflects discrimination against her for being a single mother given that, with schools expected to close, Cohen knew that Plaintiff would need to work from home to care for her children, which she alleges Cohen did not like. *Id.* ¶ 114. Plaintiff further had never been told that her performance was otherwise unsatisfactory, or that it needed to improve. *Id.* ¶ 116. Given all of these allegations, and because the Court must construe these facts in the light most favorable to Plaintiff, Plaintiff has satisfied her burden to plausibly allege that she was terminated with discriminatory intent because of her sex, at least at a motion to dismiss stage.

The same is true for Plaintiff's claim for discrimination based on her religion. Plaintiff has alleged that she is a member of a protected class (a Mormon) and an adverse action (termination). Defendants' primary argument, again, is that Plaintiff has failed to plead discriminatory intent. *See* Br. at 17-18. Although the allegations are not overwhelming, Plaintiff has pleaded sufficient circumstantial evidence to "support to a minimal inference of discriminatory motivation" as to discrimination based on religion. *See Menaker*, 935 F.3d at 30. She alleges specific, discriminatory comments made by Cohen about her Mormonism and the practices surrounding it. For instance, Plaintiff alleges that Cohen mocked her clothing, saying, "What are you *wearing*? Is that standard Mormon attire?" in front of others. Compl. ¶ 81. He also made comments including "How could you have worked at Vogue and be Mormon? Makes no sense. So where is *that* wardrobe now?" *Id.* ¶ 83. She further alleges that he asked her probing questions about the Mormon practice of wearing "garments" under regular clothes; he confused Mormonism and the Amish faith; and after swearing in a meeting, asked Plaintiff whether that was "*allowed*." *Id.* ¶¶ 84-86. Cohen also allegedly expressed his anger when

20

Plaintiff's religion was mentioned in a New York Post Page Six announcement about her hiring because he did not like that her religion was taking away from his magazine. *Id.* ¶ 87.

Construing these allegations in the light most favorable to Plaintiff, together, they create at least a minimal inference of discriminatory intent. Plaintiff has alleged a series of comments about women and Plaintiff's religion by Cohen – the most senior executive for Defendants – over the course of her employment. *See Zuckerman*, 2021 WL 4267815, at *6-7 (finding allegations sufficient to infer discriminatory intent because stray sexist comments were made by decision-maker proximate to adverse action). The allegations about the culture that Cohen instilled and perpetuated also support this inference, and – regardless of whether they meet the standard for a hostile work environment claim – can be considered with regard to a discriminatory termination claim. *See Moazzaz*, 2021 WL 827648, at *12 (permitting discriminatory termination claim to proceed based on allegations that were "too thin" for hostile work environment claim). Additionally, "[t]o determine whether remarks are probative of discrimination or are 'stray remarks' not probative of bias, the Court considers 'who made the remark, when the remark was made in relation to the employment decision, the remark's content, and the context in which the remark was made.'" *Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 238 (E.D.N.Y. 2015) (quoting *Obinabo v. Radioshack Corp.*, 522 F. App'x. 55, 57 (2d Cir. 2013) (applying standard at summary judgment)). Cohen is alleged to be the primary decisionmaker at Cohen Media, and made comments about Plaintiff's religion and attire, and about women over the course of Plaintiff's 11-month employment, during which time Plaintiff alleges she was paid less than male, non-Mormon colleagues, was not given benefits or premier office space, and was eventually terminated without any forewarning or prior negative reviews,

among other allegations.  At this stage, the Court concludes that these allegations are sufficient to plead a plausible inference of discriminatory intent.[7]

Defendants argue that Cohen, having hired Plaintiff, is entitled to a presumption that he did not fire her with discriminatory intent.  Br. at 18.  Courts in this District do consider the "same actor inference," or the proposition that it is difficult to infer discriminatory intent when the same actor hires and fires the party accusing the actor of discrimination.  *See, e.g.*, *Farmer*, 473 F. Supp. 3d at 329.  The same actor inference, however, is generally considered at the summary judgment stage.  *See id.*  Moreover, the "inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand."  *Copeland v. Rosen*, 38 F. Supp. 2d 298, 305 (S.D.N.Y. 1999).  For these reasons, and because Plaintiff alleges that while Cohen hired her, he discriminated against her by hiring her at a salary far below her qualifications, the Court will not apply such an inference to bar Plaintiff's claims at this stage.

Finally, Defendants also claim that they terminated Plaintiff for reasons not related to discrimination, including performance issues with only publishing two issues of *Avenue* over the course of a year.  Br. at 18.  Such contentions that are outside of the Complaint cannot be considered on a motion to dismiss; instead, Defendants "may present evidence and arguments to that effect in a motion for summary judgment or at trial."  *Moazzaz*, 2021 WL 827648, at *13.

---

[7] Insofar as Plaintiff is alleging discrimination based on pay disparity (*see supra* at 19 n.6), several of the comments are alleged to have been made in April 2019, when Plaintiff was finalizing the employment terms she claims were discriminatory, which would be a relevant factor in evaluating an inference of discriminatory intent.  *See* Compl. ¶¶ 19, 81, 86-88.

Therefore, Plaintiff has stated a claim for discrimination on the basis of sex and religion under Title VII and the (pre-amendment) NYSHRL.  Having stated a claim under those statutes, she necessarily has also stated a claim under the NYCHRL and (post-amendment) NYSHRL.

## III.    Discrimination Claims Based on Age

Plaintiff further alleges that she was subjected to discrimination on the basis of her age under the ADEA, NYSHRL, and NYCHRL.  *See* Compl. ¶¶ 154-159, 167-171, 178-181.  Under the ADEA, an employer must not "discriminate against any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  In order to state a claim for age discrimination pursuant to the ADEA, a plaintiff "must plausibly allege that adverse action was taken against her by her employer and that her age was a 'but-for' cause of the adverse action."  *Caputo v. Copiague Union Free Sch. Dist.*, 218 F. Supp. 3d 186, 195 (E.D.N.Y. 2016) (quoting *Marcus v. Leviton Mfg. Co., Inc.*, 661 F. App'x 29, 31-32 (2d Cir. 2016)).[8]  This standard is in contrast to other federal discrimination claims under Title VII, that require only that the protected trait was a "motivating factor" in the adverse action.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015).  The Second Circuit has "assumed without deciding" that the ADEA "but for" standard also applies under the NYSHRL.  *See Boonmalert v. City of New York*, 721 F. App'x 29, 32 (2d Cir. 2018); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105 n.6 (2d Cir. 2010).  However, "the NYCHRL differs from the ADEA because 'the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct,' but instead focuses 'on unequal treatment . . . regardless of whether the conduct is tangible.'" *Boonmalert*, 721 F. App'x at 32 (quoting *Mihalik*, 715 F.3d at 114).

---

[8] The *McDonnell Douglas* burden-shifting framework that applies to Title VII claims also applies to the ADEA.  *See, e.g.*, *Antrobus v. N.Y.C.  Health & Hosps. Corp.*, No. 19-cv-07449 (KPF), 2021 WL 964438, at *5 (S.D.N.Y. Mar. 15, 2021).

Plaintiff has alleged sufficient facts to state a claim for age discrimination at this early stage in the litigation.  "Circumstances contributing to an inference of age-based employment discrimination may include: invidious comments about people in the protected age class; more favorable treatment of younger employees; criticism of an employee's work performance in age-related degrading terms; a sequence of events leading to an employee's termination; or the timing of the termination."  *Miller v. Nat'l Ass'n of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230, 245 (E.D.N.Y. 2010).  Plaintiff alleges that Cohen made several derogatory comments about age.  For example, he commented "[s]he looks old; do you have an earlier photo of her?" when he saw the image that would be used to credit a contributing photographer's work.  Compl. ¶ 50; *see also id.* ¶ 53 (alleging similar comments about images of other women contributors).  Plaintiff alleges Cohen also did not want to feature work from a 75-year-old "venerated" contributor (Colman Andrews), saying he was "too old."  *Id.* ¶ 77.  Cohen also allegedly enjoyed pitting Plaintiff against younger female colleagues, such as 39-year old Ms. Jones, who Plaintiff alleges he did not yell at, as he did with Plaintiff, (*id.* ¶¶ 65, 70), and 38-year old Ms. Anand, who Cohen relied on to provide "a younger person's point of view" despite the fact that she did not work for *Avenue* (*id.* ¶¶ 75-76).  When Ms. Jones allegedly commented to Plaintiff that things may have been done differently "in [Plaintiff's] day," Cohen laughed after Plaintiff complained of these "ageist comments."  *Id.* ¶ 70-72.  Plaintiff further alleges that Cohen paid Ms. Jones $180,000 a year, and did not fire her despite her lack of success at her job, instead moving her within his company.  *See id.* ¶¶ 69-73.  Plaintiff also alleges that she was replaced by – and paid less than – Widdicombe, who was "younger" than her by more than a decade.  *See id.* ¶¶ 28-32, 75.  To be sure, "[w]ithout more, the mere fact that an older employee was replaced by a younger one does not plausibly indicate discriminatory motive."  *Marcus*, 661 F. App'x at 33.  However, Plaintiff

has pleaded more here (even if just barely), particularly with respect to Cohen's comments about Plaintiff's and others' ages, and his alleged preferential treatment of younger women in the office.  *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 79 (2d Cir. 2005) (noting that knowledge of an age discrepancy is necessary to give rise to an inference of discriminatory intent). Eventually when placed in context and on a fuller factual record, Cohen's comments about pictures or articles by contributors to the magazine may be insufficient to support a discrimination claim.  And Plaintiff will ultimately have to prove that age was the but for cause of adverse employment actions against her, a high hurdle given the relatively sparse facts alleged herein.  But affording Plaintiff all reasonable inferences in her favor, the allegations are sufficient to pass muster at the pleading stage for claims under the ADEA, NYSHRL, and NYCHRL, especially given the more lenient standard for adverse action under the NYCHRL (and post-amendment NYSHRL).

## IV.   Hostile Work Environment Claims

Plaintiff also argues that Defendants created a hostile work environment in violation of Title VII (as to sex and religion), the ADEA (as to age), the NYSHRL, and the NYCHRL.  *See* Compl. ¶¶ 130-134, 140-145, 150-153 (sex-based hostile work environment); *id.* ¶¶ 160-166, 172-177, 182-185 (age-based hostile work environment); *id.* ¶¶ 191-195, 202-207, 212-215 (religion-based hostile work environment).  "To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive – that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the

plaintiff's [protected characteristic]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal citation and quotation marks omitted).

The same standard applies to hostile work environment claims under the ADEA, *see Summa v. Hofstra Univ.*, 708 F. 3d 115, 123-24 (2d Cir. 2013), and claims under the NYSHRL prior to the statute's recent amendment, *see Williams v. N.Y.C. Hous. Auth.*, No. 18-cv-05912 (JGK) (RWL), 2021 WL 1109842, at *20 (S.D.N.Y. Mar. 23, 2021) ("Prior to amendments made to the NYSHRL that took effect on October 11, 2019, NYSHRL hostile environment claims were analyzed in essentially the same manner as hostile work environment claims under Title VII[.]"). However, under the NYCHRL, and the NYSHRL after October 2019, a plaintiff need not allege that the harassing or discriminatory conduct was "severe or pervasive for it to be actionable." *Williams*, 2021 WL 1109842, at *20 (NYSHRL) (citation and quotation marks omitted); *Small v. New York City Dep't of Educ.*, No. 21-cv-01527 (GHW), 2023 WL 112546, at *8 (S.D.N.Y. Jan. 5, 2023) (NYCHRL).

To determine whether Plaintiff has stated a claim for a hostile work environment on the basis of sex, religion, or age, the Court must consider "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Littlejohn*, 795 F.3d at 321 (internal citation and quotation marks omitted). "The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (citation omitted). The Second Circuit has explained that a "plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse," and

has "repeatedly cautioned against setting the bar too high." *Patane*, 508 F.3d at 113 (internal

citation and quotation marks omitted).

Defendants primarily argue that Plaintiff has failed to plead any of her hostile work

environment claims because her allegations do not meet the "severe or pervasive" standard under

Title VII and the ADEA.  Br. at 12-15.  The Court disagrees.  Contrary to those arguments,

Plaintiff has adequately pleaded a work environment riddled with repeated negative comments

about gender, age, and religion.  As previously described with regard to her sex discrimination

claims, Plaintiff alleges that Cohen regularly yelled at her, and treated her like a child, as

compared to her male colleagues.  Compl. ¶¶ 44-45, 59, 61.  She alleges that Cohen regularly

made sexist remarks about women, evaluated potential employees based on their attractiveness,

and hired the magazine's cover illustrator based on her "sexual attractiveness." *Id.* ¶¶ 47, 49.

Significantly, Plaintiff also alleges that Cohen required women to wear skirts and dresses,

implicitly permitting men to look up women's skirts from the glass staircase in the offices, and

taking no action when she complained about this. *Id.* ¶¶ 54-55.  Cohen further undercut

Plaintiff's authority by taking advantage of Plaintiff's responsibilities as a single mother to make

decisions (which he knew she opposed) at a meeting she could not attend. *Id.* ¶ 63.  He made

comments generally about age, saying that he did not want to feature work from a 75-year-old

"venerated" contributor, because he was "too old." *Id.* ¶ 77.  Cohen mocked her clothing as

"standard Mormon attire" and made other derogatory comments about her religion and attire. *Id.*

¶¶ 81, 83, 84-86.  He also appeared to favor younger women, including Ms. Jones (whom he did

not terminate despite weak performance), and Ms. Anand (for whom he asked advice about jobs

unrelated to her position). *Id.* ¶¶ 65, 70, 75-76.  Plaintiff also alleges that she was replaced by –

and paid less than –Widdicombe, who was younger than her, a man, and less experienced. *See id.*
¶¶ 28-32, 75.

Given the breadth of the pleaded comments and actions by Defendants' chief executive,
the Court cannot find on a motion to dismiss that Plaintiff has only pleaded "isolated acts";
rather, drawing all reasonable inferences in Plaintiff's favor, the Complaint details a workplace
environment in which "a reasonable employee would find the conditions of her employment
altered for the worse." *Patane*, 508 F.3d at 113. Assuming the context and tenor that Plaintiff
attributes to them, as the Court must, the pleaded comments were "more than episodic" and
"sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294
F.3d 365, 374 (2d Cir. 2002) (internal citation and quotation marks omitted); *see Makhsudova v.
City of New York*, No. 20-cv-10728 (KPF), 2022 WL 1571152, at *11 (S.D.N.Y. May 18, 2022)
(denying motion to dismiss hostile work environment claims based on allegations of continuous
and overtly hostile comments); *Gorzynski*, 596 F.3d at 102-03 (2d Cir. 2010) (remanding trial
court's grant of summary judgment on hostile work environment claim where the defendant
made "approximately six" comments "over a period of seven months").

Defendants' attempt to parse the allegations as "petty slights and trivial inconveniences"
is also unpersuasive. Br. at 14. Drawing all inferences in Plaintiff's favor, the allegations could
be found to be more than "mistreatment at work," given Plaintiff's allegations regarding Cohen's
focus on putting Plaintiff down for being an older woman who dresses modestly as a Mormon.
*Cf. Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) ("Of
course, it is axiomatic that mistreatment at work, whether through subjection to a hostile
environment or through other means, is actionable under Title VII only when it occurs because
of an employee's protected characteristic." (internal alterations adopted; citations and quotation

marks omitted)).  Plaintiff sufficiently pleads both that the environment would be considered

hostile or abusive to a reasonable person, and that she subjectively viewed the environment that

way.  Accordingly, her claims for a hostile work environment under the ADEA, Title VII, and

the NYSCHRL are sufficiently pleaded.  The same is true for her hostile work environment

claims under the NYCHRL (and post-amendment NYSCHRL), because a lower threshold

applies to claims under these statutes, and they are generally treated the same as discrimination

claims which the Court addressed *supra* in Sections II and III.  *See Zagerson v. New York City*

*Dep't of Educ.*, No. 20-cv-11055 (KPF), 2022 WL 292917, at *16 (S.D.N.Y. Jan. 31, 2022)

(denying motion to dismiss NYCHRL claims).

## V.    Retaliation Claims

Plaintiff next alleges that she was retaliated against for engaging in protected activity

under Title VII, the ADEA, the NYSHRL, and the NYCHRL.  Compl. ¶¶ 221-246.  To state a

claim for retaliation under these statutes, a plaintiff generally must allege "(1) participation in a

protected activity; (2) that the defendant knew of the protected activity; (3) an adverse

employment action; and (4) a causal connection between the protected activity and the adverse

employment action."  *Torre*, 493 F. Supp. 3d at 288-89 (internal citation and quotation marks

omitted); *see Zoulas*, 400 F. Supp. 3d at 56-57; *see also Carr v. New York City Transit Auth.*,

No. 22-792-CV, 2023 WL 5005655, at *5 (2d Cir. Aug. 7, 2023) (holding that at summary

judgment, "to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she

engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected

to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4)

there was a causal connection between the protected activity and the materially adverse action or

actions").  As to her claims under the post-amendment NYSHRL and NYCRHL, a plaintiff need

only allege that "she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (internal citations omitted); *see Arazi v. Cohen Bros. Realty Corp.*, No. 20-cv-08837 (GHW), 2022 WL 912940, at *17 (S.D.N.Y. Mar. 28, 2022). "The proper question for a retaliation claim is whether the [alleged action] to which [the plaintiff] was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 44 (2d Cir. 2019) (internal citation and quotation marks omitted).

Regardless of whether the retaliation claim is brought under federal, state, or city law, it requires a causal connection between the alleged protected activity and the retaliatory conduct at issue. *See Torre*, 493 F. Supp. 3d at 288-89 (stating that ADEA, Title VII, NYSHRL, and NYCHRL retaliation claims require "a causal connection); *Mihalik*, 715 F.3d at 112 (holding that the NYCHRL requires that retaliation was taken "as a result" of protected activity); *Arazi*, 2022 WL 912940, at *17 (holding that the NYCHRL requires "a causal connection between the protected activity and the alleged retaliatory conduct"). "To adequately plead causation, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (internal citation and quotation marks omitted).[9]

---

[9] As other courts in this District have observed, "[r]egarding causation, the law is unsettled as to whether the Supreme Court's decision in *Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 180 (2009), requires but-for causation only for ADEA claims of disparate treatment, leaving ADEA retaliation claims to be decided under the more relaxed 'motivating factor' test." *Massaro v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, No. 17-cv-08191 (LGS), 2021 WL 184364, at *5 (S.D.N.Y. Jan. 19, 2021), *aff'd sub nom. Massaro v. N.Y.C. Dep't of Educ.*, No. 21-266-CV, 2022 WL 1788203 (2d Cir. June 2, 2022). However, the Supreme Court has applied the "but-for" test in retaliation claims under Title VII, and the Second Circuit and district courts within the Second Circuit, in non-binding opinions, have largely agreed that the standard is the same

Defendants primarily argue that Plaintiff's retaliation claims fail because she does not allege that she engaged in any protected activity, and to the extent she does allege that she objected to Cohen's behavior, her allegations are not sufficiently specific. *See* Br. at 19-20. Plaintiff argues that her Complaint specifically alleges that she regularly objected to Cohen's numerous comments. *See* Opp. at 20-22. The Court need not decide whether the general comments pleaded by Plaintiffs – such as "Charles, we're better than that," and "OK, you *do* realize you just said that out loud, *right*?" – constitute protected activity because Plaintiff does not sufficiently plead a causal connection between these comments and an adverse employment action. Compl. ¶ 93. Courts in this District have granted motions to dismiss retaliation claims when "the allegedly retaliatory conduct took place more than five months after engaging in protected activity," absent other allegations of a causal connection. *Torre*, 493 F. Supp. 3d at 289. Plaintiff here does not specify when she commented on Cohen's behavior, with two exceptions. For instance, in April 2019, she allegedly "expressed her displeasure with Mr. Cohen's comments, giving him a disappointed look" after he commented on her attire. Compl. ¶¶ 81-82. In October 2019, she also allegedly objected when Cohen remarked on a new black female colleague, and also a young black model. *Id.* ¶¶ 97-103. But Plaintiff was not terminated until March 2020, at least five months after this "protected activity." Absent more specificity in

---

under the ADEA. *See Weiss v. Quinnipiac Univ.*, No. 3:20-cv-00375 (JCH), 2021 WL 4193073, at *8 n.6 (D. Conn. Sept. 15, 2021) (providing overview of current law and deciding to apply "but for" standard); *see also Abdelsayed v. NYC Dep't of Educ.*, No. 16-cv-01775 (CBA) (LB), 2019 WL 13271813, at *10 (E.D.N.Y. Mar. 12, 2019) ("Although the Second Circuit has not squarely defined the causation standard for an ADEA retaliation claim, the Court agrees with the weight of authority since *Gross* and *Nassar* recognizing that plaintiffs must demonstrate but-for causation to state an ADEA retaliation claim.") (collecting cases); *see also Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 696 (2d Cir. 2013) (applying "but-for" cause standard in the context of an ADEA retaliation claim).

terms of the timing of when she commented on Cohen's statements (even assuming it was protected activity), Plaintiff fails to adequately plead a causal connection.

The Court notes that while the NYCHRL claims are "assessed separately and independently" from the federal and state claims, Plaintiff must still plead sufficient facts to infer a causal connection, and "[e]ven under the more lenient requirements of the NYCHRL, plaintiff's claims must be more than conclusory or speculative to survive a motion to dismiss." *Dechbery v. City of New York*, No. 14-cv-2130 (KAM) (SMG), 2017 WL 11683338, at *9 (E.D.N.Y. Mar. 31, 2017) (internal citation and quotation marks omitted).  As discussed, Plaintiff does not plead any non-conclusory facts from which causation can be inferred.

Accordingly, because a causal connection is required for claims under the federal state, and city statutes, Plaintiff's retaliation claims all fail.  Accordingly, Claims 20, 21, 22, and 23 are dismissed.

## VI.    Equal Pay Act Claim

Plaintiff also alleges a violation of the NYS EPA.  *See* Compl. ¶¶ 216-220.  Claims under the New York statute are analyzed under the same framework as its federal analogue.  *See Rose v. Goldman, Sachs & Co.*, 163 F. Supp. 2d 238, 243 (S.D.N.Y. 2001).  To establish a violation of the statute, "a plaintiff must show that: [(1)] the employer pays different wages to employees of opposite sexes; [(2)] the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and [(3)] the jobs are performed under similar working conditions."  *Id.* at 242. Therefore, in a complaint, "plaintiffs typically identify a comparator, or a higher-paid colleague of the opposite gender," and in so selecting that comparator they "need not have 'identical' jobs, but a higher-paid comparator should not hold a job requiring 'greater skill, effort, and responsibility than [the] plaintiff's position.'"  *Moazzaz*, 2021 WL 827648, at *4 (quoting *Lavin-*

*McEleney v. Marist Coll.*, 239 F.3d 476, 480 (2d Cir. 2001)).  If the comparator's job does require greater skill, effort, or responsibility (thereby justifying the pay differential), the EPA claim fails.

Defendants argue that Plaintiff's NYS EPA claim is deficient because she fails to allege that she was "substantially equal to any of her alleged comparators."  Br. at 21.  Specifically, Defendants contend that because Widdicombe, the editor-in-chief of *Avenue* after Plaintiff, was hired as an employee, and not an independent contractor like Plaintiff, her NYS EPA claim fails. *Id.*  The Court does not agree with this argument because, as discussed *supra* Section I, Plaintiff has adequately pleaded that she was an employee for purposes of the motion to dismiss.

Plaintiff's EPA allegations are insufficient though because they fail to include any facts regarding Widdicombe's alleged job responsibilities.  Plaintiff contends that Widdicombe had the same job, and was paid more as a younger man, despite the fact that, unlike Plaintiff, he had never worked as an editor-in-chief before.  *See* Compl. ¶¶ 28-32, 112.  But, in terms of job responsibilities, Plaintiff only alleges that she and Widdicombe "had the same title," and "worked for the same division."  *Moazzaz*, 2021 WL 827648, at *6.  She does not allege Widdicombe's responsibilities as a manager, detail any day-to-day tasks or projects, or plead whether he "had analogous managerial responsibilities."  *Id.*  As the Second Circuit has held, even with respect to the pleadings, a plaintiff "must establish that the jobs compared entail common duties or content, and do not simply overlap in titles or classifications."  *E.E.O.C. v. Port Auth. of N.Y. and N.J.*, 768 F.3d 247, 249, 255 (2d Cir. 2014) (affirming judgment on the pleadings for the defendant on an EPA claim where the EEOC "fail[ed] to allege *any* facts concerning the attorneys' actual job duties[,] depriv[ing] the Court of any basis from which to draw a reasonable inference that the attorneys performed 'equal work'").  Widdicombe's work

need not be identical to Plaintiff's work in order for Plaintiff to state a claim, but Plaintiff does

need to provide *some* comparators in terms of job duties.  Although the Second Circuit "has

dismissed Equal Pay Act claims on the pleadings in but a handful of circumstances," those cases

were instances where . . . the complaint "stat[es] nothing about the actual content of the work

done by the [employees compared]."  *Moazzaz*, 2021 WL 827648, at *6 (quoting *E.E.O.C.*, 768

F.3d at 251).  That is the case here.  Accordingly, Plaintiff's NYS EPA (Claim 19) claim fails.

## VII.   Breach of Contract, NYLL, and Alternative FIFA Claims

Plaintiff also alleges that Defendants breached her Consultant Agreement by firing her

without cause, failing to immediately pay amounts due under her contract from her date of

termination in March 2020 through January 10, 2021 (the end of her contract term), and failing

to pay her for articles she wrote pursuant to the contract.  Compl. ¶¶ 247-257.  In addition, she

alleges that Defendants violated the NYLL (or in the alternative, FIFA) because she was not paid

for the articles she wrote for the magazine, and she was not paid the full amount owed under the

agreement because she was terminated before her contract term ended.  *See* Opp. at 24-25.

Defendants contend that, because they fired Plaintiff for cause and do not otherwise owe her

wages, she does not have a cause of action for breach of contract under the NYLL, or under

FIFA.  *See* Br. at 22-23.

### A.  Breach of Contract Claim

Taking the breach of contract claim first, "[t]o state a claim for breach of contract under

New York law, the complaint must allege: (i) the formation of a contract between the parties; (ii)

performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages."  *Edwards*

*v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) (quoting *Orlander v. Staples, Inc.*, 802 F.3d

289, 294 (2d Cir. 2015)).  Plaintiff has pleaded all of these elements.  Defendants primarily

contend that they did not breach the Consultant Agreement in failing to pay Plaintiff additional wages because she was terminated for cause.  Br. at 22-23. Because there is a dispute as to whether she was in fact terminated for cause, drawing all inferences in Plaintiff's favor, the Court cannot grant the motion to dismiss the breach of contract claim.  Moreover, Defendants do not even address the alleged breach for failure to pay for articles that Plaintiff wrote.

### B.  NYLL Claim

The Court next turns to Plaintiff's claim under the NYLL §§ 191, 193, and 198 for failure to pay wages earned.  *See* Compl. ¶¶ 250-254.  Defendants again assert that there are no outstanding wages due because Plaintiff was terminated for cause and therefore no future wages were due under the contract after her termination.  Moreover, the terms of her contract provided that, after December 2019, she was to be paid per issue.  Br. at 22-23; Reply 7-8.  Therefore, because Plaintiff admits that she was paid for the two published issue of *Avenue* (albeit after she threatened legal action), Defendants contend that there are no outstanding wages due to her.  Br. at 23 (citing to Compl. ¶ 119). The Court agrees that the NYLL claim should be dismissed but for different reasons.

Plaintiff does not plead a cause of action under the statutory provisions of the NYLL upon which she relies.  First, NYLL § 193 provides a cause of action where a plaintiff alleges a specific deduction from wages.  *See Zuckerman*, 2021 WL 4267815, at *16 (dismissing NYLL § 193 claim where the plaintiff failed to allege "a specific deduction from wages and not merely a failure to pay wages" (quoting *Goldberg v. Jacquet*, 667 F. App'x 313, 314 (2d Cir. 2016))). Plaintiff's claim regarding money owed to her for articles that she wrote or for compensation after the contract terminated are not based on an improper deduction from her wages, but rather failure to pay her entire wages under the term of the contract.  *See Dreni v. PrinterOn Am. Corp.*,

486 F. Supp. 3d 712, 728 (S.D.N.Y. 2020) ("The law in this district is clear that a failure to pay, or a withholding, of wages does not constitute a 'deduction' within the meaning of § 193."). Therefore, her § 193 claim must be dismissed.[10]

Second, while Plaintiff does not appear to bring a claim under Section 191, she references a violation under NYLL § 191 in Claim 25.  *See* Compl. ¶ 253.  NYLL § 191 only applies to manual workers, railroad workers, commission salespeople, and "clerical and other workers." NYLL § 191.  Plaintiff does not allege the category under which she falls, and the Court determines, based on her allegations, that she does not fall under any § 191 category.  She does not allege that she is owed commissions,[11] and she is paid, per her contract, in excess of $900 a week, which excludes her from the definition of "clerical and other worker."  *See* NYLL §§ 190, 198-c; *Franklin v. Waters*, No. 16-cv-09819 (AKH), 2020 WL 29875, at *1 (S.D.N.Y. Jan. 2, 2020) (finding neither § 191 nor § 198 "applies to any person in a bona fide executive, administrative, or professional capacity whose earnings are in excess of nine hundred dollars a week").  Accordingly, any claim under NYLL § 191 must be dismissed.[12]

---

[10] In August 2021, the NYLL was amended to provide that "[t]here is no exception to liability under this section for the unauthorized failure to pay wages, benefits or wage supplements." NYLL § 193(5); *see Boutsikakis v. Tri-Borough Home Care, Ltd.*, No. 15-cv-05833 (DG)(RML), 2023 WL 3620646, at *5 (E.D.N.Y. Apr. 11, 2023).  This Court agrees with the courts in this Circuit that have declined to apply the amendment to causes of action entailing nonpayment prior to the amendment, as is the case here.  *See, e.g.*, *Fersel v. Paramount Med. Servs., P.C.*, No. 18-cv-20448 (AMD) (RML), 2022 WL 14813738, at *4 (E.D.N.Y. Oct. 26, 2022) (surveying New York cases and declining to apply amendment retroactively).

[11] In contrast, in *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 265 (2d Cir. 1999), a case upon which Plaintiff relies, the court affirmed an award of unpaid commissions.

[12] NYLL § 198 does not provide a cause of action but delineates the damages and attorneys' fees that may be awarded in NYLL actions, as well as the statute of limitations.

### C.  FIFA Claim

Finally, Plaintiff alleges an alternative claim under FIFA in Claim 26.  "FIFA regulates the relationship between 'freelance work[ers]' and those who retain their services, the 'hiring party,' in New York City."  *Monzano-Moreno v. Libqual Fence Co*., No. 18-cv-180161 (MKB) (AKT), 2021 WL 730663, at *18 (E.D.N.Y. Feb. 5, 2021) (quoting N.Y.C. Admin. Code § 20-927), *report and recommendation adopted sub nom. Monzano-Moreno v. Fence*, No. 18-cv-000161 (MKB) (AKT), 2021 WL 688295 (E.D.N.Y. Feb. 23, 2021).  The statute will only apply to Plaintiff if she is later determined to be an independent contractor.  *See id.*

Even if Plaintiff is ultimately found to be an independent contractor, however, she has not adequately pleaded a FIFA claim, other than for nonpayment for articles that she wrote for *Avenue*.  FIFA § 20-929 provides in relevant part that "the contracted compensation shall be paid to the freelance worker either . . . [o]n or before the date such compensation is due under the terms of the contract; [or] [i]f the contract does not specify when the hiring party must pay the contracted compensation or the mechanism by which such date will be determined, no later than 30 days after the completion of the freelance worker's services under the contract."  FIFA § 20-929.  As part of this claim, Plaintiff alleges that she was not paid for her articles under the terms of the contract, and that she was not paid wages from the termination of her employment in March 2020 until the end of her contract on January 10, 2021.  Compl. ¶ 256.  Defendants make no argument with respect to Plaintiff's articles, and therefore, the Court will not dismiss that part of the claim.

As to Plaintiff's claim for nonpayment of monies due under the contract after she was terminated, Defendants argue that the FIFA claim should be dismissed because Plaintiff admits she was eventually paid the $18,000 she was owed for her services performed under the contract

at the time of her termination, and no future contract payments (past termination) are

recoverable.  Br. at 23.  The Court agrees.

Plaintiff does not point to any authority for the proposition that FIFA provides a cause of

action for compensation for services Plaintiff did not perform, but would have performed, during

the remainder of the term of the contract if she were not terminated.  *Cf. St. Clair v. Sansal*, 155

N.Y.S. 3d 712, 713 (N.Y. Civil Ct. 2021) (permitting FIFA claim for biweekly wages that were

not paid during plaintiff's employment); *Varn v. Orchestrade*, No. 19-cv-02875 (MKB), 2020

WL 13558690, at *12 (E.D.N.Y. March 30, 2020) (finding that plaintiff plausibly stated a FIFA

claim when defendants "failed to fully compensate him for the services he rendered").  The text

of the administrative code provision cited by Plaintiff provides only that payment is due to a

freelance worker either "on or before the date such compensation is due under the terms of the

contract," *see* FIFA § 20-929(a)(1), or no later than 30 days after the completion of services

contemplated by the contract if a contract does not state when payment is due, *see id.* 20-

929(a)(2).  Thus, FIFA provides a cause of action for Plaintiff to recover for services *performed*,

to which money is owed or money was untimely paid.  Plaintiff does not allege that Defendants

violated a term of the contract when they belatedly paid her $18,000, and does not allege that this

payment was made more than 30 days after services were rendered.  Accordingly, Plaintiff's

FIFA claim may only be maintained as to the unpaid amounts for articles that she wrote for

*Avenue*.

## CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED with respect to Claims 19,

20, 21, 22, 23, 25, and 26 (except as it relates to nonpayment for articles she wrote for *Avenue*).

The motion is DENIED as to all other claims.  Defendants' alternative request to bifurcate

discovery so that the parties may first conduct discovery on their employment relationship is also

DENIED as inefficient.  IT IS HEREBY ORDERED that Defendants shall file their answer to

Plaintiff's remaining claims no later than **21 days** after the date of this Opinion and Order.  IT IS

FURTHER ORDERED that, within **14 days** of service of the Answer, the parties shall file a

proposed Civil Case Management Plan and Scheduling Order, which is available at

https://www.nysd.uscourts.gov/hon-jennifer-l-rochon.

The Clerk of Court is respectfully directed to terminate the motion pending at ECF No.

16.

Dated:  August 21, 2023
       New York, New York

                                                                  SO ORDERED.

                                                                 JENNIFER L. ROCHON
                                                                 United States District Judge